Robert W. Sadowski
Robert W. Sadowski PLLC
*Pro hac vice pending*
800 3rd Avenue, 28th Floor
New York, New York 10022
Tel. No.: (646) 503-5341
rsadowski@robertwsadowski.com

Adam C. Josephs
The Josephs Law Firm
255 Alhambra Circle, Suite 700
Coral Gables, FL 33134
Tel. No.: (305)445-3800
acj@florida-attorneys.com

Jonathan Minick
Jonathan S. Minick P.A.
169 E. Flagler St., Suite 1600
Miami, FL 33131
Tel. No.: (786) 441-8909
jminick@jsmlawpa.com

*Attorneys for Relator Kalynda K. Gonzales Stokes, Ph.D.*

**Sealed**

19  25193  CV-
Gayles

FILED BY_____ D.C.

DEC 18 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Mag - Otazo-Reyes

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA *ex rel.*
KALYNDA K. GONZALES STOKES,
Ph.D.,

      Plaintiff/Relator,

    - against -

FLORIDA INTERNATIONAL
UNIVERSITY, TOMÁS R. GUILARTE,
Ph.D., KENNETH FURTON, Ph.D.,
ANDRES GILL, Ph.D., JENNIFER
DZIEDZIC, MS, and CHANGWON YOO,
Ph.D.,

      Defendants.

**COMPLAINT**

**FILED *IN CAMERA* AND UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)**

1

## TABLE OF CONTENTS

I.      Preliminary Statement and Nature of the Action ..................................................... 5

II.     Jurisdiction and Venue............................................................................................. 8

III.    Parties...................................................................................................................... 9

        A.      Parties and Other Key Personnel............................................................... 9

        B.      Other Key Players And Researchers ......................................................... 11

IV.     Legal Framework ................................................................................................... 12

        A.      The Federal False Claims Act ("FCA") ................................................... 12

        B.      HHS Definitions of FCA-related Terms.................................................... 12

V.      Research Process Overview ................................................................................... 14

        A.      The NIH Grant Process ............................................................................. 14

        B.      Relator's Role in Manganese-Related Grants ........................................... 16

        C.      Process for Publication in Scientific Journals .......................................... 18

        D.      Relator's Role in Guilarte's Scientific Publications................................. 18

VI.     Relator's Introduction to Guilarte ........................................................................ 19

VII.    Issues of Guilarte's Studies of Manganese-induced Parkinsonism ..................... 19

        A.      Study Hypotheses...................................................................................... 20

        B.      Monkey Groups for Studies 1 and 2.......................................................... 21

        C.      Detrimental Issues with Guilarte's Monkey Cohorts ............................... 23

        i.      Damaged Monkey Brain Tissue ............................................................... 23

        ii.     Female vs. Male "Naïve Control" Tissue for Studies 1 and 2................... 24

VIII.   Falsifications in Study 1: Dopamine Cell Counts ................................................ 25

        A.      Total Dopamine Cell Counts by Relator ................................................... 25

2

    i.   Summary ................................................................................................25

    ii.   Findings from Dopamine Cell Counts.................................................26

  B.   Fraud and Falsification on "Primary Grant" Proposal.................................28

    i.   Selective Outcome Reporting (SOR) on a Federal Grant Application...........29

    ii.   SOR: Data Omission ................................................................30

    iii.  SOR: Falsification of Experimental Monkey Groups ......................32

    iv.  SOR: Further Biased Interference with Reporting of Results ...............33

  C.   Fraud and Falsification: Following Grant Submission.................................34

    i.   Guilarte Refuted New Findings of Dopamine Cell Loss After Manganese Exposure ....35

    ii.   Omission of Data for Publication in a Scientific Journal .................................36

    iii.  Guilarte's Insistence of Biased Dopamine Viewpoint .................................36

  D.   Supporting Evidence ................................................................................40

IX.   Falsifications in Study 2: Cholinergic Cell Counts........................................... 40

  A.   Findings from Cholinergic Cell Counts .......................................................40

  B.   Fraud and Falsification on "Primary Grant" Proposal.................................42

    i.   Experimental Design ...................................................................42

    ii.   Data Collection.............................................................................44

    iii.  Data and Statistical Analyses ....................................................45

    iv.  Reporting Results .......................................................................45

  C.   Supporting Evidence ................................................................................46

X.    Additional Points of Concern............................................................................ 46

  A.   Guilarte's "Aging" Concern for the Dopamine but not the Cholinergic Studies ...........46

    i.   Introduction ...............................................................................46

    ii.   Fraud and Falsification of Design, Data, and Statistical Analyses.................47

    iii.  Supporting Evidence ...............................................................51

B.    Guilarte Falsified Information for Publications in Scientific Journals ............................51

    i.    Introduction ....................................................................................................52

    ii.    Fraud and Falsification of Design, Data, and Statistical Analyses in Publications .........52

    iii.    Amphetamine-Exposed Animals: "Imaged Controls" ....................................53

    iv.    Supporting Evidence .....................................................................................55

C.    Guilarte Interfered with the Performance of NIH-Funded Research ...............................55

XI.    Florida International University Made False Certifications ...............................................56

B.    A Fraudulent "Primary Grant" Budget Created by Defendants .....................................56

C.    Relator's "Good Faith" Allegation ................................................................................57

D.    Defendants' Failure to Uphold HHS Public Health Service Policies on Research ............

Misconduct    .................................................................................................................60

XII.    Counts ..................................................................................................................................62

A.    Count One .....................................................................................................................62

B.    Count Two .....................................................................................................................63

C.    Count Three ...................................................................................................................64

D.    Count Four.....................................................................................................................64

XIII.    Appendix .............................................................................................................................78

Plaintiff the United States of America *ex rel.* Kalynda K. Gonzales Stokes, Ph.D. ("Relator"), by and through Relator's attorneys, Robert W. Sadowski PLLC, The Josephs Law Firm, and Jonathan S. Minick P.A. alleges for her complaint as follows:

## I.       PRELIMINARY STATEMENT AND NATURE OF THE ACTION

1.       This is a civil action brought by Relator, Kalynda K. Gonzales Stokes, PhD, on her own behalf and on behalf of the United States of America ("United States"), against Defendants, Florida International University ("FIU"), Tomás R. Guilarte, PhD ("Guilarte"), Kenneth Furton, Ph.D., ("Furton"), Andres Gil, Ph.D., ("Gil"), Jennifer Dziedzic ("Dziedzic"), and Changwon Yoo, Ph.D. ("Yoo") (collectively "Defendants") under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), to recover damages sustained by, and penalties owed to, the United States as the result of Defendants having knowingly presented or caused to be presented to the United States false claims for the payment of research grant funds disbursed, in excess of the amounts to which Defendants were lawfully entitled, from 2009 through the present, as more specifically detailed *infra.* In addition, Relator alleges a claim for retaliation under 31 U.S.C. § 3730(h) and Florida State law for hostile work environment, harassment and discrimination and whistleblower retaliation.

2.       Public health is "the science of protecting and improving the health of people and their communities" ("What is Public Health", Center for Disease Control, CDC)[1]. Medical research contributes to the betterment of society by providing medical interventions, treatments, and reprieve from deadly diseases. The United States government (the "Government"), therefore, funds most of the medical research in this country through federal grants. Because public funding is limited, research grants are highly competitive and are based on a strict set of criteria. Only

---

[1] https://www.cdcfoundation.org/what-public-health

researchers with the most deserving studies receive funding.  A funded researcher is obligated to spend these funds responsibly and carry out the studies in an ethical manner.

3.      The Defendants have abused their obligation to aid the public in progressing toward a healthier and safer society by submitting a false and fraudulent grant application to the United States to obtain over one million dollars in payments over a three-year period.  The National Institute of Environmental Health Sciences ("NIEHS"), a subdivision within the National Institutes of Health ("NIH"), funded this grant beginning in April 2018.  Unbeknownst to the Government, the Defendants knowingly used false data and flawed experimental design in their grant proposal, introducing multiple detrimental confounders into their proposed studies.  The Defendants also intentionally proposed an exaggerated budget for their grant studies.  After September 2018, the Defendants hid and minimized the extent of Guilarte's wrongdoing.

4.      The Defendants knowingly made false, misleading, and fraudulent claims in the grant proposal through selective and circumstantial reporting of previous and preliminary results and their significance concerning animal (monkey) demographics and experimental design.  They relied upon the fact that virtually nobody would know the true details of this particular research project.  The Defendants also made numerous false certifications, including not fostering a research environment that discourages misconduct and not protecting NIH funds from misuse.

5.      The fraudulent activity was organized by Guilarte, carried out by Dziedzic and Yoo, and concealed by Gil and Furton.  The scope is far reaching, partly because Guilarte, as a Dean of Public Health and Social Work, runs one of the largest laboratories at FIU that serves as a research hub for scientists at the University and other institutions.  Furthermore, Guilarte's actions over time and others' accounts have revealed his systemic, patterned research misconduct while at Johns Hopkins University, Columbia University, and currently, FIU.

6.      The Defendants', particularly Guilarte and Dziedzic, research misconduct revealed itself to Relator over a five-year period.  During this time, Guilarte and Dziedzic authored many scientific publications that display questionable results and conclusions from studies funded by public grants.  These publications were relied upon by Guilarte in obtaining further grant awards in the tens of millions of dollars.

7.      Relator's first attempt to report Guilarte's research misconduct and abusive supervision to the University was made in the Fall 2017.  The FIU ombudsperson at the time, Dr. Rebecca Friedman, was negligent and unresponsive.  As such, Relator never had the opportunity to inform Dr. Friedman of her concerns.

8.      Almost a year later, Relator informed a newly appointed FIU ombudsperson, Dr. Wilson, of the dire situation with Guilarte as well as the hostile and toxic work environment.  Dr. Wilson notified Defendants, Furton and Gil.

9.      In September 2018, while Relator was on FMLA[2] medical leave due to stress-induced illness from Guilarte's retaliatory behavior and gender harassment, Relator again reported Guilarte's research misconduct to FIU's Office of Research and Economic Development ("ORED") Department.

10.      Relator reported Defendants' fraud and research misconduct to "ensure funding is awarded to responsible research" and to "protect the public's trust in science" (NIH's Office of Research Integrity, NIH-ORI).[3]

11.      Numerous pieces of evidence such as additional grant applications, animal and method protocols, experimental design, and study data/results related to Relator's project were kept hidden by the Defendants.  Thus, Relator was limited in the evidence she could provide in

---

[2] Family and Medical Leave Act.
[3] https://ori.hhs.gov/sites/default/files/2017-12/9_Suspect_Misconduct.pdf

this filing.  Nevertheless, Relator provided a wealth of information demonstrating the Defendants' intentional, knowingly, and reckless actions leading to fraud, fabrication, falsification, and research misconduct of NIH-funded research.

12.     FIU's Policy on research misconduct allegations required Gil, as Vice President of ORED, to determine whether an inquiry is warranted within 10 days. Gil stalled any "inquiry" or investigation into the allegations for 8 months, during which time, the Defendants secured additional federal grant funding, while continuing to make false research claims in scientific publications, conference abstracts, and media reports.  In addition, Relator was fired from FIU.

13.     FIU's internal inquiry cleared Guilarte of research misconduct in June 2019, halting a full, independent investigation into his highly questionable ethical behavior as a federally funded researcher.

14.     It is unknown if the University has notified the Government.

15.     The Defendants have enabled Guilarte to continue his patterned behavior of research misconduct at their University, as well as his abusive supervision and gender harassment/discrimination of his staff, faculty, and laboratory members.  The negative impacts of his misconduct will continue to worsen as his research continues to be cited and spur other scientists to invest in futile studies.  Additionally, more federally funded research will be impeded by his misconduct, bullying, and retaliatory behavior toward his laboratory members, resulting in a consistent high turnover of employees/trainees.

## II.     JURISDICTION AND VENUE

16.     This Court has jurisdiction over the claims brought under the FCA pursuant to 31 U.S.C. § 3730(b)(1), 28 U.S.C. §§ 1331, 1345, and 1367.

17.     Venue lies in this District pursuant to 31 U.S.C. §§ 3732(a) and (b), and 28 U.S.C. §§ 1391(b) and 1391(c), because Defendants are headquartered and located in this District, conduct

business in this District, and because many of the acts complained of herein occurred in this District.

### III.    PARTIES

#### A. Parties and Other Key Personnel

18.    Plaintiffs are the United States of America on behalf of its agency the United States Department of Health and Human Services ("HHS").  The National Institutes of Health ("NIH") are a division of HHS, which awards monetary grants to scientific researchers and their affiliated institutions to conduct peer-reviewed, approved research studies.

19.    Relator resides in Florida and has personal knowledge of the facts, making her an original source.  Relator has voluntarily provided her knowledge of the facts in *"good faith"* to the Government.  Relator previously informed numerous University officials and filed an official complaint of research misconduct against Defendant Guilarte ("Guilarte") to the Office of Research and Economic Development ("ORED") at FIU.  Relator holds a Ph.D. in Neuroscience from Emory University, where she trained with two of the world's leading primate and Parkinson's disease researchers at Yerkes National Primate Center.  Relator most recently held a postdoctoral position in the Guilarte laboratory, 2.5 years at Columbia University as a Provost fellow followed by 3 years at FIU, in the Department of Environmental Health Sciences ("EHS").  Relator was a key asset to the Guilarte laboratory because of her unique expertise in non-human primate (*i.e.*, monkey) neuroanatomy and circuitry, tissue processing, and microscopy.  Relator was a project leader for the manganese primate studies funded by NIH federal grants.

20.    Defendant, Guilarte, resides in Florida and holds a Ph.D. in Environmental Health from Johns Hopkins University, where he was a professor for 30 years and recently inducted into their Society of Scholars.  After Chair of Environmental Health Sciences at Columbia University for five years, Guilarte relocated to FIU in December 2016 to take a role as Dean of the Robert

Stempel College of Public Health & Social Work.  Guilarte specializes in neuroimaging and neurotoxicology.

21.     Defendant, FIU, is a public 501(3)(c) nonprofit university located in Miami, Florida.  FIU is classified as an "R1 Doctoral University - Very high research activity" under the Carnegie Classification of Institutions of Higher Education: "institutions awarded at least 20 research/scholarship doctoral degrees and had at least $5 million in total research expenditures (as reported through the National Science Foundation (NSF) Higher Education Research & Development Survey (HERD))."  FIU receives federal scientific funding from the National Science Foundation (NSF) and the NIH.

22.     Defendant, Kenneth Furton, Ph.D., ("Furton") resides in Florida and holds a Ph.D. Furton is the Provost, Executive Vice President and Chief Operating Officer at FIU.  Furton oversees Guilarte and knows about Guilarte's fraudulent work and abusive supervision.

23.     Defendant, Andres Gil, Ph.D., ("Gil"), is Vice President for Research and Economic Development ("ORED"), Dean of the University Graduate School, President of the FIU Research Foundation and Professor of Public Health.  Gil oversees research misconduct allegations at FIU.  Gil also supervises Guilarte.

24.     Defendant, Jennifer Dziedzic, MS, ("Dziedzic") is the Guilarte laboratory manager and has directly reported to Guilarte for over 20 years.  Dziedzic was present and partook in many of the events alleged in this complaint.  Dziedzic will contribute to a portion of the grant's studies.

25.     Defendant, Changwon Yoo, Ph.D., ("Yoo") was the Interim Chair of the Biostatistics Department under the Stempel College of Public Health & Social Work at FIU at the time of these incidences.  Guilarte identified Yoo as a statistics consultant for the 2017 NIH-funded

RO1 grant.  Currently, he resumes the role of Associate Professor in the FIU EHS department under Guilarte's supervision.

### B.  Other Key Players And Researchers

26.      Stephanie Garcia, MPH, MSHRM, is a Research Scientist in the FIU Biostatistics Department under Guilarte's supervision.  Ms. Garcia is also the statistical computing director and REDCap Administrator for the Biostatistics Consulting and Service Center (BCSC; previously Integrated Biostatistics and Data Management Center).  Ms. Garcia has been largely responsible for training Relator in statistical analyses and provided data quality support.

27.      Jay Schneider, Ph.D., is the collaborator and co-Principal Investigator on many of Guilarte's previous manganese-related NIH grants.  Dr. Schneider is a Professor in the Department of Pathology, Anatomy & Cell Biology at Thomas Jefferson University in Philadelphia, PA.  Dr. Schneider's role in Guilarte's research misconduct is unknown.  He has been forthcoming to Relator during their discussions about the manganese primate project.

28.      Christopher Grayson, MBA, is the Director of Research Integrity at FIU.  Mr. Grayson is responsible for managing the regulatory requirements of several research compliance areas.  Relator reported a research misconduct allegation against Guilarte in the presence of Mr. Grayson and an FIU attorney, Liz Marston, in September 2017.

29.      Kathleen Wilson, MM, EdM, EdD, is a Professor of Voice, Faculty Fellow of the Office of the Provost, and the FIU Ombudsperson, to whom Relator reported her concerns about Guilarte's research misconduct and abusive supervision in the summer of 2017.  Dr. Wilson tried to guide Relator, while still a Guilarte lab member, on problematic dealings with Guilarte.  Dr. Wilson confidentially reports faculty and staff concerns to Provost Furton.

30.      Suzanna Rose, Ph.D., is the Founding Associate Provost of the Office to Advance Women, Equity & Diversity and a Professor of Psychology and Women's Studies at FIU.  Relator

also reported her concerns to Dr. Rose about Guilarte's research misconduct and abusive supervision.  Dr. Rose tried to assist Relator to the best of her ability.

## IV.    LEGAL FRAMEWORK

### A. The Federal False Claims Act ("FCA")

31.    The FCA provides, in pertinent part, that:

> any person who –
> (A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
>
>             *          *          *
>
> is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000… plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729; 64 Fed. Reg. 47,099 (1999).

### B. HHS Definitions of FCA-related Terms[4]

32.    False certifications constitute false claims under the FCA.

33.    HHS defines research misconduct as: "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results."

34.    For purposes of the FCA, **"falsification"** is defined as "manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record" (Sec. 93.103 Research misconduct in 42 C.F.R. Part 93 Public Health Service, "Public health service policies on research misconduct").

35.    For purposes of the FCA, **"research records"** are defined as "the record of data or results that embody the facts resulting from scientific inquiry, including but not limited to, research proposals, laboratory records, both physical and electronic, progress reports, abstracts, theses, oral

---

[4] For the full definition of research misconduct, *also see* 42 C.F.R. § 93.103.

presentations, internal reports, journal articles, and any documents and materials provided to HHS or an institutional official by a respondent in the course of the research misconduct proceeding" (42 C.F.R. § 93.224).

36.     The definition of **"research record"** also includes "documents and materials that embody the facts resulting from the research that are provided by the respondent at any point in the course of the research misconduct proceeding" (42 C.F.R. § 93.224).

37.     For purposes of the FCA, the term **"knowingly"** is defined as "a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." (31 U.S.C. § 3729 (b)(1)(A)).  No proof of a specific intent to defraud is required to show knowledge. (31 U.S.C. § 3729 (b)(1)(B)).

38.     For purposes of the FCA, the term **"claim"** is defined as "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—(i) is presented to an officer, employee, or agent of the United States." (31 U.S.C. § 3729 (b)(2)(A)).

39.     For the purposes of the FCA, the term **"obligation"** is defined as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." (31 U.S.C. § 3729 (b)(3))

40.     For the purposes of the FCA, the term **"material"** is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." (31 U.S.C. § 3729 (b)(4)).

41.     For the purposes of the FCA, the term **"applicability"** refers to "allegations of research misconduct and research misconduct involving: (i) Applications or proposals for PHS support for biomedical or behavioral extramural or intramural research, research training or activities related to that research or research training, such as the operation of tissue and data banks and the dissemination of research information; (ii) PHS supported biomedical or behavioral extramural or intramural research; (iii) PHS supported biomedical or behavioral extramural or intramural research training programs; (iv) PHS supported extramural or intramural activities that are related to biomedical or behavioral research or research training, such as the operation of tissue and data banks or the dissemination of research information; and (v) Plagiarism of research records produced in the course of PHS supported research, research training or activities related to that research or research training." (42 C.F.R. § 93.102 (b)(1)).

42.     Furthermore, **"applicability"** also includes "any research proposed, performed, reviewed, or reported, or any research record generated from that research, regardless of whether an application or proposal for PHS funds resulted in a grant, contract, cooperative agreement, or other form of PHS support." (42 C.F.R. § 93.102 (b)(2)).

## V.     RESEARCH PROCESS OVERVIEW
### A. The NIH Grant Process[5]

43.     The goals of NIH-supported research are to advance the understanding of biological systems, improve the control of disease, and enhance health.

44.     An NIH-appointed study section of external researchers reviews each grant application assigned by a related NIH institute, such as NIEHS.  The volunteer reviewers are matched with grant applications relevant to their scientific discipline or current research areas.

_____

[5] https://grants.nih.gov/grants/policy/nihgps/html5/toc_test_417.htm

45.    The grant reviewers score the research grant applications based on their overall impact to reflect the assessment of the likelihood for the project to exert a sustained, powerful influence on the research field(s) involved, considering, among other pertinent factors:

- Significance: information about the basic biology of the grant's project, importance of grant subject, research opportunities, and new findings.  The grant should address important problems or critical barriers in the field, a strong scientific premise for the project, and the project's potential improvements of scientific knowledge, technical capability, and/or clinical practice.

- Investigator(s): the project director or principal investigator (P.I.) and any other person, regardless of title or position, who is responsible for the design, conduct, or reporting of research funded by the NIH, or proposed for such funding.

- Innovation: something new or improved, including research for the development of new technologies, refinement of existing technologies, or development of new applications for existing technologies.

- Approach: a description of the experiments that will address each "specific aim" or grant project and a statement about the project's significance, place in the scientific field, and long-term goals.

- Environment: evidence that the scientific environment will contribute to the probability of project success.  Examples are the lab setup and environment, institutional support, and the availability of physical resources.

46.    Reviewers will consider each of the five criteria in the determination of scientific and technical merit and give a separate score for each.  An application does not need to be strong in all categories to be judged likely to have a major scientific impact.  For example, a project that by its nature is not innovative may be essential to advance a field.

47.    Three of the grant reviewers will provide a written summary of strengths, weaknesses, and other highlights, along with the "impact score," to the grant applicant.

48.     If funded, grant recipients are required to provide an annual Research Performance Progress Report, documenting their progress, significant project changes, personnel status, and plans for the subsequent budget year.  A final report is also required at the time of grant closeout.

49.     If considered a non-fundable grant proposal, a research scientist may apply again after addressing the study section reviewers' comments and concerns.

50.     Defendants verified all data and statements in the grant application by signing off on the grant after reviewing all application details.

### B.  Relator's Role in Manganese-Related Grants

51.     Relator was an active part of Guilarte's laboratory team from 2013 to 2018.

52.     When Relator first joined the laboratory at Columbia University (New York, NY), Guilarte was receiving on-going funding (04/01/2001 – 04/30/2016) from a successful NIH-NIEHS R016 grant application using manganese-exposed monkeys: Project#: 5R01 ES010975, *Molecular & Behavioral Effects of Low-Level Mn Exposure*.  Relator performed numerous studies funded by this grant.

53.     Guilarte also received funds on behalf of Relator's studies as a Provost Fellow at Columbia University, which covered her $50,000 annual salary and provided "extra" funds for her training, conference attendance, and other support for her advancement into a future Professorship. Provost fellows (given to only four other postdoctoral scientists) told Relator that their advisers received around an "extra" $50,000 a year for their training, and the Assistant Provost informed Relator there were plentiful funds to cover her expenses.  Guilarte, however, supplied minimal "extra" funds to Relator, impeding her progress and training.

---

[6] See Appendix A, Definitions.

54.      Relator assisted Guilarte with two R01 grant applications to NIH-NIEHS in 2015 and 2016.  She provided grant figures as Guilarte requested.   These grant proposals were not approved for funding.

55.      During the spring 2017 at FIU, Guilarte asked Relator to assist with writing another R01 grant application for a summer 2017 submission: Project#: R01 ES029344, *Cholinergic neuron degeneration in manganese neurotoxicity*.[7]   NIH-NIEHS decided to fund this grant proposal, starting 01/01/2018 and ending on 03/31/2021.  ***This is the "Primary Grant" that will be discussed in this complaint.***

56.      Prior to the drafting of this grant application, Relator had completed cells counts of nigral dopamine cells in all groups (16 animals) but the male "naïve control" monkeys.

57.      Relator had also completed her cells counts of cholinergic neurons in the striatum of female naïve controls, "amphetamine-only," "manganese-only" and "amphetamine + manganese" monkeys (12 animals).  The male "naïve controls" were missing from the analyses for reasons described in the following sections.

58.       Relator provided three figures and text on the methodology and preliminary results for this grant proposal, as requested by Guilarte.

59.      Guilarte refused to give Relator a copy of all four grant proposals, even though she was the project lead on the manganese studies.

60.      Relator was able to obtain a copy of the "Primary Grant" from an external source in the summer 2018.  After review, the fraud she suspected all along was confirmed.

61.      Realtor is unsure of the contents of the other three grant applications to the NIH.

---

[7] This Second R01 Funded Grant is the "Primary Grant in Question." *See* Section IV.B.(ii).

### C.  Process for Publication in Scientific Journals

62.     Medical scientific researchers publish their study results to better society by providing in-depth knowledge about the underlying mechanisms of disease processes and new therapeutic interventions or alternative technological interventions for diseases and disorders.

63.     Once research studies are completed, the research group submits a summary of their findings and their significance to a scientific journal of their choice.  A group of volunteer scientists with related expertise review and score the manuscript in a similar manner as for NIH grants.  A summary of reviewer comments is given to the authors of the publication, as well as an "acceptance" or "rejection" of the paper.

64.     Scientific publications correspond to currency for researchers: a large number of publications improve one's chance at receiving (or maintaining) an academic tenure-track position and federal grant funding.

65.     Scientific journals with a higher impact factor also play a role.  An "impact factor" has become an indicator of a journal's importance within a field, such as neuroscience.  It represents the yearly average number of citations to recent articles published in a journal.  Thus, research scientists strive for publication in journals with a higher impact factor.  Recent criticisms have brought attention to the impact factor's bias, limitations and usefulness.

### D.  Relator's Role in Guilarte's Scientific Publications

66.     Relator's only publication during her time in the Guilarte laboratory was a 2015 review article on the comparisons between manganese-induced parkinsonism and Parkinson's disease.  Guilarte took first authorship, which is atypical scientific conduct of a mentor.

67.     Guilarte's fraudulent actions prevented Relator from successfully publishing her grant-funded results as first author of data-containing papers.

68.     Guilarte, therefore, impeded Relator's opportunity to obtain NIH-funded grants, as well as her contributions to the scientific research record.

## VI.     RELATOR' S INTRODUCTION TO GUILARTE

69.     In August 2013, Relator was indirectly introduced by a colleague to Guilarte about a postdoctoral position in his laboratory at Columbia University (New York, NY).

70.     Guilarte informed Relator about a federally-funded project in his laboratory that required a monkey expert to proceed: Environmentally induced parkinsonism via metal (*i.e.,* manganese; "Mn") toxicity in monkeys.

71.     Relator hypothesized to Guilarte that a loss of striatal cholinergic neurons and/or a significant dysfunction of the cholinergic system—a subject matter of Relator's expertise—may occur in his experimental model of manganese-induced parkinsonism.  Guilarte expressed his interest in Relator's hypothesis and expertise, and therefore, offered her the position.

72.     In November 2013, Relator joined the Guilarte laboratory for the following guaranteed opportunities: (1) to be the project lead on a unique model of environmentally-induced parkinsonism; (2) to continue to focus her research on her expertise of neuroanatomy of the cholinergic systems in monkeys; (3) to be an exclusive recipient of a Columbia University Provost Fellowship (only five postdocs were chosen) that provided funding for her salary, laboratory supplies, training, and work-related travel; (4) to receive a "higher than average" salary ($50,000 per year) for a postdoctoral position; and (5) to work at an Ivy League university recognized as a Center of Excellence for Parkinson's disease research and clinical care.

## VII.     ISSUES OF GUILARTE'S STUDIES OF MANGANESE-INDUCED PARKINSONISM

73.     The purpose of the general study was to (a) determine if the effects of manganese exposure in monkeys mimic the behavioral abnormalities and changes in brain activity like that

observed in humans with manganese-induced parkinsonism (*i.e.*, a syndrome with deficits similar to those observed in Parkinson's disease), and (b) determine the type of brain cells that die after long-term manganese (Mn) exposure.  Humans develop parkinsonism from environmental or occupational exposure, drug abuse (ephedrone), or via a genetic mutation.

74.     The study's results would also benefit individuals who suffer from manganese-induced parkinsonism by introducing possible therapeutic interventions, which are currently limited.

75.     This animal model of human manganese-induced parkinsonism will be referred to as "long-term manganese exposure in monkeys," "manganese-exposed monkeys," or "monkeys exposed long-term to manganese."

76.     The following studies were funded by grant applications to NIH-NIEHS: Projects 5R01 ES010975 and R01 ES029344.

### A. Study Hypotheses

77.     Guilarte's Hypothesis (before and after Relator joined his laboratory):

- **Study 1 – Dopamine**: Loss of dopamine-containing (*i.e.*, dopaminergic) neurons in the Substantia Nigra pars compacta (SNpc) **does not occur** in monkeys exposed long-term to manganese.

78.     Relator and Guilarte's Hypothesis (after Relator joined his laboratory):

- **Study 2 – Cholinergic**: Loss of acetylcholine-containing (*i.e.*, cholinergic) neurons in the striatum and/or other brain regions **occurs** in monkeys exposed long-term to manganese.

79.     Relator worked on Study 1 first, followed by concurrent efforts on Study 2.

80.     Study 1 began before Relator joined the Guilarte laboratory, but their study results were incomplete due to their lack of expertise about the required methods and background for studying monkeys.  Relator was hired in 2013 to move forward "Study 1 – Dopamine."

## B.  Monkey Groups for Studies 1 and 2

81.     Prior to Relator joining the Guilarte laboratory, a monkey cohort of 21 monkeys was tested for the most effective dosing of manganese and for method optimization.  Guilarte summarized these findings in 11 publications in scientific journals from 2006 to 2014.

82.     For Relator's direct projects (Studies 1 and 2), the "first cohort" consisted of 15 male monkeys (Animal ID: Mn1 – Mn15) composed of four experimental groups (Table 1):

- First Group: two male naïve control monkeys
- Second Group: four male "amphetamine-only" monkeys ("Imaged")
- Third Group: three male "manganese-only" monkeys
- Fourth Group: five male "amphetamine + manganese" monkeys

83.     From 2011 to 2015, nine of the first cohort 15 monkeys (Table 1) were exposed long-term (i.e., 1 year or more) to manganese to induce parkinsonism.

84.     The majority of the 15 monkeys (13 out of 15; Table 1) underwent behavioral testing (at Thomas Jefferson University by Dr. Jay Schneider) and brain imaging (i.e., functional MRI and P.E.T. scans at Johns Hopkins University by Dr. Dean Wong), except the two "naïve control" male monkeys (Mn13 and Mn14).

85.     During the P.E.T. scans, 10 out of 15 of the first cohort monkeys (Table 1) were exposed to amphetamine (AMPH), except the two "naïve control" (Mn13 and Mn14) and the three "manganese-only" monkeys (Mn8, Mn10, M12).

| | Animal ID | Experimental Group | Sex | Final Age (years) |
|---|---|---|---|---|
| **Naïve Controls** | 1 | Naïve | Female | 8.3 |
| | 2 | Naïve | Female | 8.3 |
| | 3 | Naïve | Female | 4.0 |
| **Naïve Controls** | 4 | Naïve | Male | 6.4 |
| | 5 | Naïve | Male | 7 |
| | 6 | Naïve | Male | 7.4 |
| | 7 | Naïve | Male | 6.8 |
| | Mn13 | Naïve | Male | 8.8 |
| | Mn14 | Naïve | Male | 8.7 |
| **Amphetamine-only** | Mn15 | Imaged / 1 AMPH | Male | 9.3 |
| | Mn2 | Imaged / 3 AMPH | Male | 8.7 |
| | Mn5 | Imaged / 3 AMPH | Male | 9.0 |
| | Mn7 | Imaged / 3 AMPH | Male | 8.9 |
| **Manganese-only** | Mn8 | Mn / No AMPH | Male | 11.1 |
| | Mn10 | Mn / No AMPH | Male | 10.7 |
| | Mn12 | Mn / No AMPH | Male | 10.5 |
| **Amphetamine + Manganese** | Mn1 | Mn / 3 AMPH | Male | 8.6 |
| | Mn4 | Mn / 3 AMPH | Male | 10.3 |
| | Mn9 | Mn / 2 AMPH | Male | 10.0 |
| | Mn11 | Mn / 2 AMPH | Male | 9.8 |
| | Mn6 | Mn / 4 AMPH | Male | 9.3 |
| | Mn3 | Mn / 4 AMPH | Male | 9.8 |

**Table 1.** Details of the sex, age, and experimental group of the monkeys used in Relator's studies. The shaded area represents the first cohort of monkeys for Relator's manganese-induced parkinsonism project (Animal ID: Mn1-Mn15). For the second cohort purchased, the female "naïve control" monkeys are represented by Animal ID: 1-3. The male "naïve control" monkeys (Animal ID: 4-7) are the third cohort of purchased monkeys. The number of amphetamine exposures during imaging are stated for each animal. Abbreviations: manganese, Mn; amphetamine, AMPH.

86.    Two "reversal" monkeys (Mn3 and Mn6; Table 1) were also included: their manganese exposure was stopped for ten months, and then, they were euthanized. The period of

no manganese exposure was to allow the monkeys to recover and determine if the negative effects of manganese subsided.

87.     It is noteworthy to mention Guilarte's inadequate experimental design from the beginning of the manganese study, which included only two "naïve control" monkeys.  The standard, acceptable number of animals for statistical analyses must be at least three animals.

## C.  Detrimental Issues with Guilarte's Monkey Cohorts
### i.   Damaged Monkey Brain Tissue

88.     The post-mortem pathological studies, which began in 2013, were performed by Relator in the brain tissue of the four groups of first cohort monkeys (Table 1).

89.     During the early phase of "Study 1: Dopamine," Relator discovered the brain tissue of four monkeys from the first cohort had been damaged during the post-mortem processing.  This tissue was unusable for the dopamine (and cholinergic) cell counts:

- Two male "naïve control" monkey: Mn 13 (unusable for Study 2) and Mn14
- One male "amphetamine-only" monkey: Mn5
- One male "amphetamine + manganese" monkey: Mn1

90.     Relator discovered an additional three monkeys had inter-mixed brain hemispheres, resulting in missing brain sections of the striatum region.  These monkeys, in addition to the three stated in (87), could not be used for the cholinergic cell counts (Study 2) in the striatum:

- One male "amphetamine-only" monkey: Mn15
- One male "amphetamine + manganese" monkey: Mn9
- One male "reversal" monkey: Mn6

91.     In summary, **three monkeys** could not be used for "Study 1 – Dopamine" and **seven monkeys** for 'Study 2 – Cholinergic."

92.     Furthermore, Study 1 was left with **only one** "naïve control" monkey (Mn13) and Study 2 with **none**.

23

### ii.   Female vs. Male "Naïve Control" Tissue for Studies 1 and 2

93.     Because of the lack of "naïve control" tissue, Guilarte approved the purchase of four "naïve control" male animals (in 2015), representing the "second cohort" of monkeys. Guilarte, however, insisted these control monkeys were only to be used for "Study 2 – Cholinergic".

94.     Relator needed more "naïve control" monkeys for "Study 1- Dopamine" as well. Guilarte said it was not necessary.  With great resistance, Guilarte eventually gave in to Relator's requests to use these four new "naïve control" monkeys for both studies.

95.     In January 2017, Relator discovered another issue: four of the monkeys that were believed to be male monkeys were in fact **female** monkeys, and the company could not provide one monkey's demographics, resulting in only three usable for publication.

96.     Guilarte had Relator purchase a "third cohort" of male "naïve control" monkeys (Animal ID: 4-7), insisting again that this brain tissue could only be used for "Study 2 – Cholinergic" analyses, because "Study 1 – Dopamine" had "control" monkeys for its analyses.

97.     For **five months until Guilarte conceded**, Relator pleaded with Guilarte to allow the use of this third cohort' tissue for her dopamine cell counts that had only one male "naïve control" monkey (Mn13).

98.     Although Relator had completed dopamine cell counts in **19 monkeys**, Guilarte insisted Relator purchase a "fourth cohort" of male "naïve control" monkeys, consisting of brain tissue from 7 monkeys.  The reasons for this purchase will be explained in **Section X(A)**.

99.     Guilarte stated the "fourth cohort" was purchased specifically for the dopamine cell counts, unlike the previous two cohorts.  The subsequent dopamine cell counts would be performed in **26 monkeys**, an unusually large number of monkeys for pathology studies.

## VIII.   FALSIFICATIONS IN STUDY 1: DOPAMINE CELL COUNTS

100.    Relator's "Study 1 – Dopamine" project was to determine if long-term manganese exposure resulted in detrimental changes to the dopamine system, a brain region that loses dopamine cells in Parkinson's disease.

101.    This dopaminergic project was funded by Guilarte's long-standing NIH-NIEHS R01 manganese grant under Project#: 5R01 ES010975, *Molecular & Behavioral Effects of Low-Level Mn Exposure*, and indirectly by the current "Primary Grant" (R01 ES029344). "Indirectly" refers to the fact Guilarte used money from the cholinergic "Primary Grant" to purchase experimental supplies for "Study 1 – Dopamine" and fully cover Relator's salary as she worked on this project.

102.    Guilarte displayed fraudulent activity and research misconduct months prior to submission of the "Primary Grant," manipulating Relator's completed data, progress and preliminary results in the grant proposal.  After the "Primary Grant" submission to NIH-NIEHS in July 2017, Guilarte's fraudulent activities increased related to the dopamine studies, along with his retaliation and mistreatment of Relator.

### A.  Total Dopamine Cell Counts by Relator

#### i.   Summary

103.    From 2015 to 2018, Relator completed four sets of cell counts of SNpc dopamine neurons and was supposed to perform a fifth, but her tissue was contaminated by another Guilarte laboratory member.  The duplication of results is not standard for research studies.

104.    Guilarte was searching for data to uphold his dopamine hypothesis, and Relator was fighting against Guilarte's unethical approach to manipulate the data.

105.    Contrary to typical research studies, the number of "naïve control" monkeys varied greatly between the five groups of cell counts, making it difficult to make solid conclusions.

Guilarte's experimental design was inadequate for an in-depth method such as stereological cell counts, unbeknownst to Relator when she joined the Guilarte laboratory.

106.    The following values represent the percentage of the naïve control cell counts, representing either a decrease or increase in dopamine cell number for each group.

107.    When the "naïve control" monkeys only included male monkeys (third and fourth counts), **a consistent decrease** in the number of dopamine cells between "Manganese-only" and "naïve control" monkeys was observed.

108.    The final fourth cell count demonstrated the most solid of all the counts, as it compared all the available male monkeys and used the most appropriate counting scheme for dopamine cells in primates.

109.    Guilarte still declared to **only publish data that omitted** the four "naïve control" monkeys.  Relator refused to publish unethically to appease his need to prove his hypothesis.

110.    None of these data were ever published in a scientific journal.

### ii.  Findings from Dopamine Cell Counts

111.    For the **first counts** (2015), Relator completed dopamine cell counts in **nine** of the "first cohort's" monkeys.  This experiment contained only one "naïve control" monkey (Mn13). The percentage change in cell number could not be calculated using one "naïve control" monkey.

- Naïve control: one male monkey (Mn13)

- Amphetamine-only: three male monkeys (Mn15, Mn2, Mn7)

- Amphetamine + Manganese: five male monkeys (Mn4, Mn9, Mn11, Mn3, Mn6)

112.    For the **second counts** (2016), Relator completed dopamine cell counts in **15** of the "first and second cohort's" monkeys.  This experiment contained four "naïve control" monkeys (Animal ID: 1-3), which were found to be female a year later, and 1 male "naïve control" monkey (Mn13).

- <u>Naïve control</u>: three female (7954, 8074, T002) and one male (Mn13) monkey

- <u>Amphetamine-only</u>: same three male monkeys: **20% increase**

- <u>Manganese-only</u>: three male monkeys (Mn8, Mn10, Mn12); **7% increase**

- <u>Amphetamine + Manganese</u>: same five male monkeys; **35% increase**

- Guilarte insisted (early 2017) Relator omit dopamine cell counts of the female "naïve control" monkeys listed above, resulting in **12** total monkeys for the publication. The analyses only contained one male "naïve control" monkey from the "first cohort" again (Mn13). The percentage change in cell number could not be calculated with one "naïve control" monkey.

113.     For the **third counts** (mid 2017), Relator completed dopamine cell counts in the **4** male "naïve control" monkeys of the "third cohort."  Guilarte added these data to Relator's previous dopamine cell counts (with females excluded) from 2016, totaling **16** monkeys.  Once the proper controls were included, manganese-induced dopamine cell loss became apparent.

- <u>Naïve Control</u>: one male (Mn13) and four male monkeys (4-7)

- <u>Amphetamine-only</u>: same three male monkeys; **23% loss**

- <u>Manganese-only</u>: same three male monkeys; **35% loss**

- <u>Amphetamine + Manganese</u>: same five male monkeys; **6% loss**

114.     For the **fourth counts** (late 2017), Relator completed dopamine cell counts in **16** of the first and third cohorts' monkeys.  This experiment contained four male "naïve control" monkeys (Animal ID: 4-7) and one male "naïve control" monkey (Mn13).   Relator's new classification scheme for the dopamine cell counts was employed for this analysis.

- **All neuromelanin-containing cells**: a combination of the two groups below, representative of all dopamine neurons in the SNpc of the primate brain

    - <u>Naïve male controls</u>: N/A

    - <u>Amphetamine-only</u>: **37% loss**

    - <u>Manganese-only</u>: **27% loss**

    - <u>Amphetamine + Manganese</u>: **20% loss**

- **TH/Neuromelanin cells**: contain the TH protein and neuromelanin

  - Naïve male controls: N/A
  - Amphetamine-only: **40% loss**
  - Manganese-only: **51% loss**
  - Amphetamine + Manganese: **24% loss**

- **Neuromelanin-only cells**: contain only neuromelanin

  - Naïve male controls: N/A
  - Amphetamine-only: **27% increase**
  - Manganese-only: **83% increase**
  - Amphetamine + Manganese: **37% increase**

115. For the **fifth counts** (early 2018), Relator completed dopamine cell counts in **3** second cohort female "naïve control" monkeys (Animal ID: 1-3) for a publication on sex comparisons of dopamine cell counts. One female monkey was excluded based on the absence of demographic details. Relator's new classification scheme was used again.

- Naïve control: three female monkeys (7954, 8074, T002)

116. For the **sixth** set of dopamine cell counts (mid 2018), brain tissue from **26** monkeys was available, consisting of 12 "naïve control" monkeys from all four cohorts. As stated above, this experiment was ruined by contamination from another lab member.

117. Guilarte severely retaliated against Relator for the loss of her experiment.

118. Relator went on medical leave in August 2018.

### B. Fraud and Falsification on "Primary Grant" Proposal

119. HHS defines research misconduct as: "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results."

- For purposes of the FCA, "falsification" is defined as "manipulating research materials, equipment, or processes, or changing or omitting data or results such

that the research is not accurately represented in the research record" (42 C.F.R. Part 93(103)).

- The NIH-ORI states that scientists should only use data in grant applications that is **"as valid and reliable as in published articles."**[8]

120.    Guilarte has demonstrated selective manipulation of data to meet the requirements of his current interests and needs.

### i.    Selective Outcome Reporting (SOR) on a Federal Grant Application

121.    **Selective Outcome Reporting** (SOR) occurs when scientific researchers "report their findings selectively—choosing to report selected outcomes and analyses based on the results."[9] SOR results in reporting bias, "wherein only a subset of the original outcomes measured and analyzed in a study are fully reported based on the magnitude of the treatment effect or the statistical significance of selected outcomes."[9]

122.    Guilarte partook in selective outcome reporting frequently in the federal "Primary Grant" application, scientific publications with federal financial support, and data presentations to the scientific and public communities.

123.    For the "Primary Grant," Guilarte selectively reported (1) details of experimental design, (2) study results and conclusions, (3) the status of research projects, and (4) budgetary requirements for his studies, risking outcome inconsistencies and misleading results.

124.    Guilarte's selective reporting inflated his laboratory's progress and success, experience with research techniques, "scientific rigor," training and research environment, and financial needs to strengthen his federal grant application, and thus, ensure funding potential.

---

[8] https://ori.hhs.gov/sites/default/files/2018-11/Applying%20for%20a%20Grant%20508%20Rasterized.pdf
[9] https://www.ncbi.nlm.nih.gov/books/NBK100617/

125.    By this fraudulent research activity, Guilarte risked outcome inconsistencies, misleading results, and uninformed and inappropriate treatment choices related to public health concerns regarding manganese exposure.

126.    As Dean of Public Health and Social Work, Guilarte's reporting bias is likely more harmful to public health than most.

### ii.  SOR: Data Omission

127.    During the grant drafting process in April to July 2017, Guilarte insisted Relator **omit** the female "naïve control" data from their future publication summarizing the dopamine cell counts: *"DO NOT use the female monkeys for the TH SNpc manuscript. You have enough control animals from the initial cohort to write the manuscript."* (Email from Guilarte to Relator on April 6, 2017.) A single male "naïve control" monkey is insufficient for research studies.

128.    Guilarte subsequently insisted Relator **also omit** completed dopamine cell counts from the same monkeys in "Primary Grant" Figure 1 (Figure 1-B1, B2), resulting in data shown only for the following animals (Figure 1-A1, A2):

- Naïve Control: one male monkey (Mn13)
- Amphetamine-only: three male monkeys (Mn15, Mn2, Mn7)
- Manganese-only: three male monkeys (Mn8, Mn10, Mn12)
- Amphetamine + Manganese: five male monkeys (Mn4, Mn9, Mn11, Mn3, Mn6)

129.    Guilarte exhibited inconsistencies in his demands for the inclusion or exclusion of experimental groups for the dopamine and cholinergic studies (**Section IX**):

- For Table 1 of the "Primary Grant" application, Guilarte emphasized the female "naïve control" monkeys as a vital part of the proposed cholinergic studies.
- For Grant Figure 1, Guilarte omitted dopamine cell counts from these monkeys but included them in Figures 2 and 3 for the cholinergic studies.



**Figure 1.** Comparison of dopamine cell counts across experimental groups and sex. (A1) Bar graph was taken from the "Primary Grant" Figure 1. Guilarte omitted the female "naïve control" monkeys from (A1), although their cell counts were completed. For the "control" group, the single "naïve control" monkey was combined with the three "Amphetamine-only" monkeys. For the "Mn-exposed" group, the three "Manganese-only" monkeys were combined with the five "Amphetamine + Manganese" monkeys. The average number of dopamine cells (± standard error of the mean) was shown for the "control" and "Mn-exposed" groups. (A2) Shows the number of dopamine cells for each of the 13 monkeys included in (A1). (B1) Bar graph shows the two comparison groups as in (A1) but with the female "naïve control" data included. (B2) Shows the number of dopamine cells for each of the 16 animals included in (B1), demonstrating the **high variability among monkey groups**. One group easily cancels out another, <u>concealing the potential effects</u> of sex, amphetamine, and/or manganese on cell counts. These data were not ready for publication and should have been identified as "preliminary data" in the "Primary Grant" application. Instead, Guilarte stated this study was complete and showed no cell loss after manganese exposure.

- For Grant Figures 2 and 3, Guilarte omitted completed dopamine cell counts from three "Amphetamine-only" and five "Amphetamine + Manganese" monkeys but included them for the dopamine cell counts in Figure 1.

### iii. SOR: Falsification of Experimental Monkey Groups

130.    For "Primary Grant" **Figure 1**, Guilarte also misrepresented experimental groups, excluding amphetamine as a potential confounder for the interpretation of the results:

- **"Control" group**: one "naïve control" and three "Amphetamine-only" monkeys (total = 4 animals)

- **"Mn-exposed" group**: three "Manganese-only" and five "Amphetamine + Manganese" monkeys (total = 8 animals)

131.    Multiple reasons exist for Guilarte's false grouping of monkeys for the dopamine cell count analyses.

132.    First, the NIH grant reviewers may be less inclined to fund another of Guilarte's monkey manganese grants if they were aware of valuable brain tissue loss from monkeys purchased with federal grant funds due to poor experimental design and handling.

133.    Second, Guilarte would have to reveal only one "naïve control" was available.

134.    Third, Guilarte could not perform statistical tests on the dopamine cell counts in Grant Figure 1 (Figure 1(A1) of this document) because of the data containing a single male "naïve control" monkey (Mn13).  For statistical analyses, the minimum requirement for the number of animals is three.

135.    Fourth, Guilarte would have to use the term "amphetamine" in his grant proposal and explain its potential effects on the results.  Guilarte did not mention this word a single time.

136.    Fifth, Guilarte would have to avoid making these types of false statements in the "Primary Grant": *as shown in **Figure 1**, we now have performed unbiased stereological cell*

counting of tyrosine hydroxylase (TH)-positive DA neurons in the entire volume of the substantia nigra pars compacta (SNpc) of these Mn-exposed monkeys and controls and **found no significant differences in SNpc DA neuron number.**" Then, he also could not boast about proving his dopamine hypothesis.

137.    Last, Guilarte could not use his dopamine findings to demonstrate his laboratory's progress on federally funded grants to justify receiving more federal funds ($1.1 million) to examine the cholinergic systems after toxic manganese exposure.

### iv.  SOR: Further Biased Interference with Reporting of Results

138.    Guilarte disregarded amphetamine as a potential confounder for interpreting the study's results (discussed in **Section X(B)(iii)**) in the "Primary Grant" and near future publication of dopamine cell counts.  Previous literature has clearly demonstrated amphetamine exposure (either short- or long-term) **decreases** TH protein levels and/or dopamine cell numbers.

139.    Guilarte told Relator that "naïve control" tissue was unnecessary for her publication in a scientific journal, pressuring Relator to quickly move forward with the manuscript drafting, even in its current inadequate state.

140.    By his manipulation of the data, **no statistically significant difference** was found for the dopamine cell counts between the two groups (Grant Figure 1; Figure 1(A1) of this document), supporting Guilarte's long-standing hypothesis that manganese exposure does not cause dopamine cell degeneration.

141.    Guilarte used this finding to inflate the importance of studying the cholinergic systems in monkeys exposed long-term to manganese.

142.    If the cell counts were shown for each monkey, a decrease in the number of dopamine cells would be clearly shown for the "Manganese-only" and possibly "Amphetamine-only groups (Figure 1(A2) and (B2) of this document).

143.    For **five months** before the "Primary Grant" submission, Guilarte impeded Relator from performing the required experiments for cell counts on the four new male "naïve control" monkeys (Animal ID: 4-7).

144.    Relator sought advice from two FIU Biostaticians, Dr. Yoo and Ms. Garcia, about the proper grouping of the monkeys for statistical analyses to be included in her publication.

145.    Dr. Yoo and Ms. Garcia agreed with Relator that "Amphetamine-only" monkeys should not be used as a "naïve control" group for comparisons with the "Manganese-only" or "Amphetamine + Manganese" groups.  Guilarte skipped this meeting for unknown reasons.

146.    At the time of the grant submission, Relator began experiments using the male "naïve control" brain tissue (Animal ID: 4-7) for the third set of dopamine cell counts.

147.    For reasons out of Relator's control, her progress was delayed on the new dopamine cell counts, yet this did not prevent Guilarte from misrepresenting the data in "Primary Grant" Figure 1 (refer to Figure 1(A1) of this document) and further pressuring Relator to publish: *"Unbiased stereological cell counting of TH-positive neurons (mean ± SEM) in the complete substantia nigra pars compacta (SNpc) showed* **no significant differences** *in the number of TH-positive neurons between control (n=4;  423,538 ± 16,069) and Mn-exposed animals (n=8; 436,864 ± 34,599) (p>0.05) (right-side graph)."*

148.    Two months later, the problem was resolved, and Relator immediately began her new cell counts in Animals 3-7.

### C.  Fraud and Falsification: Following Grant Submission

149.    The "Primary Grant" was submitted to NIH-NIEHS by Guilarte in July 2018.

150.    With laboratory issues resolved, Relator completed her dopamine cell counts.

151.    Guilarte frequently expressed his disapproval of using the four "naïve control" monkeys to Relator and other Guilarte laboratory members.  His reasoning at the time was based

34

on different originating monkey colonies of the first and third monkey cohorts, which is unavoidable for studies involving non-human primates.

152. Guilarte's abusive behavior toward Relator continued and worsened.

### i. Guilarte Refuted New Findings of Dopamine Cell Loss After Manganese Exposure

153. On August 23, 2017 in a Guilarte lab meeting, Relator presented results from her third set of dopamine cell counts that included the four male "naïve control" monkeys. The data revealed a statistically **significant loss** of nigral dopamine cells in "Amphetamine-only" (23% loss) and "Manganese-only" (35% loss) monkeys.

154. During September to October 2017, Relator used a more precise classification scheme for grouping nigral dopamine cells as in human Parkinson's disease patients. Relator adjusted her dopamine cell groups in a similar manner.

155. In a meeting with Guilarte on October 3, 2017, Relator presented new findings from her fourth dopamine cell counts that revealed a **similar pattern of loss** as the previous counts. This new quantification, however, revealed a wealth of information about alterations in the dopamine-neuromelanin system in manganese-induced parkinsonism, which had never been shown before.

156. Relator requested to present these data in the form of a scientific abstract for a 2018 scientific conference to receive feedback from her colleagues and experts in the field.

157. Guilarte then proposed a new concern about an **age difference** between the male "naïve control" and "Manganese-only" monkeys (described in **Section X(A)**). He refused to allow Relator to present her findings at the 2018 scientific conference.

158. Guilarte accused Relator of withholding the monkey ages from him. Relator had previously emailed Guilarte these ages on 17 other occasions (beginning on April 4, 2017).

159.     Guilarte displayed anger and agitation toward Relator: *"in one statement, what are you prepared to tell the world about these data?"* He strongly disapproved of her data. Relator informed Guilarte that she had consulted with Parkinson's disease experts, who claimed her cell count data were solid.

### ii.  Omission of Data for Publication in a Scientific Journal

160.     On October 17, 2017, Relator met in-person with Guilarte to discuss whether he would allow her to include "naïve control" data and appropriately grouped animals for statistical analyses in their future publications.

161.     Guilarte displayed extreme hostility and harassment toward Relator, the worst case in her four years as his mentee. While recording himself on his personal cell phone, Guilarte confirmed he would not allow Relator to include "naïve control" data in their publication on dopamine cell counts, followed by *"I have told you this many times."*

162.     Guilarte still insisted that the dopamine cell loss in the manganese-exposed animals was due to an "aging" effect and not the manganese itself. Relator pleaded with Guilarte to reconsider what he was instructing her to do on a scientific publication that would have an international-wide influence.

163.     Relator clearly stated that she would not accept his unethical demands, and therefore, must abandon her two publications. Guilarte threatened Relator to tread carefully and taunted her to report him to the FIU Ethics Board and the NIH Office of Research Integrity. Afterward, Relator was devastated but knew she must consult an FIU official about Guilarte's abusive supervision and research misconduct.

### iii.  Guilarte's Insistence of Biased Dopamine Viewpoint

164.     Guilarte continued to falsely claim manganese exposure does not cause dopamine cell loss in media reports, publications, weekly lab meetings and presentations.

165.    Guilarte expressed this continual behavior before and after grant submission, after the discovery it would be funded, and after it began funding.

166.    Example 1 (April 6, 2017): *"**DO NOT** use the female monkeys for the TH SNpc manuscript. You have **enough control animals from the initial cohort** to write the manuscript. The male which turn out to be female monkeys were purchased **not because** you did not have sufficient animals for the **TH studies** in the SNpc but because you did not have the number of adequate tissue for the striatum for the ChAT interneuron studies."*

167.    Example 2 (April 29, 2017): *"I am happy to look at any analysis but at the end of the day the problem is that if you break the data by category the animal numbers are low and there is **still no difference** between control and Mn in TH neuron number which is **the most important goal of the manuscript**." ... "If you don't **believe** by now that there is **no change** we have some **serious problem**! Making the paper longer is not going to help. It's just going to set you back even more."*

168.    Example 3 (May 3, 2017): *"In all honesty, I have no idea what you are talking about. I would like to set up a meeting tomorrow. I think **this is getting out of hand**. Thank you."*

169.    Example 4 (May 5, 2017): *"**I will not accept** another delay. This paper needs to be finished and submitted."*

170.    Example 5 (August 18, 2017): *"Hi, This is what happens when you wait too long."*

171.    Example 6 (August 18, 2017): *"Relator, As you say, with no disrespect, you don't get it; ... Don't get fixed on the monkey **it's the fact that dopaminergic neurons don't die what counts**."*

172.    Example 7 (August 23, 2017): *"I would like to see the individual data from all animals as well as the **age** and treatment of the animals before presenting at lab meeting."*

173.     Example 8 (August 23, 2017): *"Although I am not opposed to presenting at lab meeting **if** the data is presented as above."*

174.     Example 9 (August 23, 2017): *"In regards of an abstract, I am not supportive until a manuscript is written and submitted."*

175.     Example 10 (September 20, 2017): *"in front of everyone in this forum, I am saying that **I do not think the use of these new naïve male monkeys is a good idea**."*

176.     Example 11 (October 5, 2017): *"... As I indicated in our 1:1 meeting on Tuesday, I believe that the potential differences you are seeing between the 4 naïve control animals and the 3 Mn-treated animals may be a result of TH-neuron loss from **normal aging**. **Now** that I have seen the data, have the **age** of the animals, and read the aging papers, I am **more convinced** that is the case. When I asked you Tuesday if the two groups were different in age, you indicated that they **were not**. But in fact, now that I have the age data and I do a **t-test** they are **highly significantly different in age**."*

177.     On October 9, 2017, Relator contacted Lina Herran from FIU's Human Resources Employee and Labor Relations (HR-ELR) department about her employment contract with FIU. Relator was nervous Guilarte was going to fire her for not abiding by his demands.

178.     On October 10, 2017, Relator spoke to her previous graduate school mentor on how to professionally and ethically handle the dispute between Guilarte and herself.  Relator also sought feedback about her recent findings and *"aging"* in monkeys.

179.     On October 11, 2017, Relator sought therapy from a psychologist to deal with her work-induced anxiety and depression and to receive advice on how to navigate her working relationship with Guilarte.  Relator struggled with the unprofessional work conditions in the Guilarte laboratory and Guilarte's forceful compliance with his research misconduct.

180.    On October 19, 2017, Relator contacted the FIU Ombudsperson, Dr. Rebecca Friedman, for feedback and advice about her abusive situation with Guilarte, but she was unresponsive.

181.    On November 1, 2017, Guilarte informed Relator his "Primary Grant" proposal was going to be funded for three years by NIH-NIEHS.

182.    In November 2017, Guilarte stopped paying for Relator's attendance to scientific conferences, although it was an agreement in her contract. Relator began paying for herself.

183.    On November 9, 2017, Guilarte requested Relator purchase more monkeys to examine his new "aging" hypothesis. In addition, he agreed to promoting Relator to Research Assistant Professor in the spring 2018.

184.    On January 1, 2018, Guilarte displayed a threatening demeanor to Relator about her current job position, as well as who she confides in at the University.

185.    On May 3, 2018, Guilarte was irritated and dismissive when Relator presented complete data from the female "naïve control" monkeys compared to the male "naïve control" monkeys for a sex comparison publication. The NIH has declared the importance of examining potential sex differences in research study animals. Relator believed she could uniquely contribute to this topic, because few researchers study non-human primates.

186.    Relator continued working diligently on "Study 1 – Dopamine" project until August 2018. During this time, Guilarte limited his interactions and mentorship of Relator, leaving her to feel isolated and afraid about her future career in academia.

187.    On July 18, 2018, Guilarte informed Relator that he would not promote her.

### D.  Supporting Evidence

188.    Relator gathered evidence for these circumstances from multiple sources: federal grants, scientific publications, emails with Guilarte, meetings with Guilarte, weekly lab meetings with the Guilarte laboratory, and scientific (PowerPoint) presentations.

## IX.    FALSIFICATIONS IN STUDY 2: CHOLINERGIC CELL COUNTS

189.    Relator's second project in the Guilarte laboratory was to determine if chronic manganese exposure resulted in significant changes to the cholinergic system of the striatum, a brain region negatively affected by the loss of dopamine cells in Parkinson's disease.   The cholinergic (*i.e.*, acetylcholine-expressing) cells in the striatum can alter dopamine cell activity, and vice versa.

190.    This cholinergic project was originally funded by Guilarte's former long-standing NIH-NIEHS R01 manganese grant: Project#: 5R01 ES010975, *Molecular & Behavioral Effects of Low-Level Mn Exposure* and his current "Primary Grant" (R01 ES029344).

### A.    Findings from Cholinergic Cell Counts

191.    This study was carried out in the brain tissue of the same non-human primates used for "Study 1 – Dopamine."

192.    As stated in **Section VII(C)(i)**, brain tissue from seven monkeys (**Mn1, Mn5, Mn6, Mn9, Mn13, Mn14, and Mn15**) was unusable for the cholinergic cell counts, resulting in a lack of male "naïve control" monkeys for statistical comparisons from the study's beginning.

193.    The cholinergic study lacked male "naïve control" monkeys and an insufficient number of "Amphetamine-only" monkeys (only two) for the statistical analyses.

194.    From November 2015 to December 2016, Relator completed one set of counts of cholinergic cells in the striatum (consists of the caudate nucleus and putamen regions) of **11 monkeys** (Table 1):

- Naïve Control: three female monkeys

- Amphetamine-only: two male monkeys (Mn2, Mn7)

- Manganese-only: three male monkeys (Mn8, Mn10, Mn12)

- Amphetamine + Manganese: three male monkeys (Mn4, Mn11, Mn3)



**Figure 3.** Comparison of cholinergic cell counts across experimental groups and sex. (A1, A2) Bar graphs were taken from the "Primary Grant" Figure 2. Cell counts from the caudate nucleus are shown in (A1, B1) and for the putamen (A2, B2). The average number of cholinergic cells (± standard error of the mean) is shown for the "control" and "Mn-exposed" groups. In (A1, A2), Guilarte omitted the "Amphetamine-only" and "Amphetamine + Manganese" monkeys, although their cell counts were completed. For the "control" group, the female "naïve control" monkeys are represented, and the "Manganese-only" for the "Mn-exposed" group. In contrast, cell count data for the four groups of monkeys are shown in (B1, B2) to demonstrate the high variability among groups when amphetamine is considered an independent variable.

195.    The cholinergic cell counts were a tedious task that took over a year to complete. Relator took a short break for her pregnancy and move to Florida with the Guilarte laboratory.

196.    Within the caudate nucleus and putamen of the striatum, subregions exist that have different functions, which variably change in Parkinson's disease.

197.    Relator's data demonstrated a different pattern of cell loss between the caudate nucleus and putamen for the experimental groups (Figure 2).  A more drastic loss of cholinergic cells was observed in the putamen of "Manganese-only" monkeys (Figure 2-A2, B2) compared to the caudate nucleus (Figure 2-A2, B1), mirroring a similar regional loss as in Parkinson's disease.

## B.  Fraud and Falsification on "Primary Grant" Proposal

198.    Guilarte demonstrated research misconduct prior to the "Primary Grant" submission and fraudulent activity during the drafting of the grant proposal in a similar manner as for "Study 1 – Dopamine."   Guilarte falsified important experimental details in his grant application to inflate the significance of the proposed studies, and therefore, obtain federal funding. Guilarte knowingly misled the NIH reviewers, who were his fellow peers.

199.    After successful grant funding, Guilarte intentionally impeded Relator's progress on the projects listed under Specific Aims 1 and 2 and refused to discuss them with her.  When Relator took medical leave in August 2018, she had not worked a single day on the "Primary Grant," after its funding began five months earlier.

200.    After the "Primary Grant" submission to NIH-NIEHS in July 2017, Guilarte's fraudulent activities continued, along with his retaliation and mistreatment of Relator.

### i.   Experimental Design

201.    At the time Guilarte began writing his grant proposal in April 2017, he was aware of Relator's serious concerns about his faulty experimental design, improper grouping of the study's animals, and data origin that would lead to unfeasible results.

202.    Guilarte inflated his laboratory's previous rigor and success with various research methods, resulting in risky behavior patterns to obtain federal grant funding. Guilarte's laboratory

has performed certain techniques stated in the grant but were discovered to be incorrect by Relator. His laboratory lacks proper training, accountability, equipment maintenance, and lab management. These potential faulty results have been published in multiple papers by Guilarte.

203.    Guilarte failed to specify the sampling plan and allowed the performance of multiple small studies, depending on his desired outcome of the results.  For example, Guilarte requested Relator perform cell counts on specific groups of monkeys randomly, as needed.

204.    The subsequent examples of fabricated "positive" aspects by Guilarte about the grant's experimental design demonstrate his failure to assure reproducibility and enable replication of the "Primary Grant" studies.  His careless behavior could impede the progress of other research groups, leading them down false avenues of investigation, and thus, interfering with their grant funding success.

205.    Guilarte falsely asserted in the grant proposal that *"always the same side"* of the brain was used for the proposed grant studies, and all brains underwent identical post-processing methods.  Guilarte removed Relator's accurate description of these methods in his final grant proposal.

206.    Guilarte intentionally removed Relator's statement informing the NIH reviewers that tissue slicing from 22 brains had been completed.  Instead, Guilarte stated "***some** of the slabs were sectioned into 50-μm-thick coronal slices."*

207.    Against Relator's advice and expertise on the application of staining techniques and its limitations to distinguish cell types, Guilarte falsely asserted these methods would provide a resolution to the grant's proposed questions.

208.    Relator warned Guilarte that "axonopathy" or loss of axons/nerve fibers cannot be quantified as he proposed in this grant proposal. However, Guilarte deliberately included this false information to overstate the *"rigor"* of the study.

209.    Guilarte deleted Relator's statement about the limitations of the *"soma size determination"* study from the final grant version. In fact, Guilarte did not discuss any method limitations in the grant, except for his third specific aim, which is not standard practice for grant applicants. The NIH R01 guidelines for the Research Plan Form state: "Discuss potential problems, alternative strategies, and benchmarks for success anticipated to achieve the aims" (G.400.PHS 398 Research Plan Form, page 142).

### ii.  Data Collection

210.    Guilarte stopped data collection (December 2016) on the "body" and "tail" regions of the caudate nucleus (brain region of the striatum) based on desired results and intermediate significance testing for Relator's abstract submission to the 2017 Society of Toxicology conference.

211.    Guilarte instructed Relator to finish these cholinergic counts at a separate time, which she did for the caudate nucleus "body" in February 2017. Relator did not have another opportunity to finish the counts in the caudate "tail" region because of troubleshooting serious issues in the Guilarte laboratory.

212.    Guilarte's flawed experimental design resulted in the counting of cholinergic cells at different time points in the experiment. The "third cohort" of male "naïve control" monkeys (Animal ID: 4-7) would have undergone cell counts years after those already completed in 11 monkeys.

213.   Guilarte underreported Relator's progress on the cholinergic cell counts in the striatum to inflate the "Primary Grant's" budget and to give the false impression of the grant's studies rapid progression in future "Progress Reports" to NIH-NIEHS.

214.   Guilarte falsely stated that the striatal cholinergic cell counts were completed in only six of the eleven animals, engaging in selective reporting.  Relator had completed counts in all 11 monkeys eight months before the "Primary Grant" submission.

### iii.  Data and Statistical Analyses

215.   Guilarte misrepresented the available animal number for projects under Specific Aims 1 and 2 of the "Primary Grant."

216.   Guilarte failed to conduct a well-founded power analysis for the "Primary Grant." Instead, Guilarte founded his power analysis for the entire grant project based on **seven monkeys that were unusable for Specific Aims 1 and 2**.

217.   By including these extra animals, Guilarte deceived the NIH grant reviewers to believe his proposed studies met the sample size requirements for statistical analyses.

218.   The statistical tests used for Grant Figures 1 and 2 misrepresented the data shown.

219.   Guilarte omitted the statistical analysis section written by Relator and replaced it with Dr.Yoo's ideas that falsely combined monkey groups into either "control" or "Mn-exposed." Guilarte concealed the fact that subgroups contained amphetamine-exposed monkeys.   On previous occasions, Dr. Yoo had agreed this was not proper grouping of animals for statistics.

### iv.  Reporting Results

220.   For "Primary Grant" Figure 2, Guilarte selectively reported results from the female "naïve control" and "Manganese-only" monkeys (Figure 2-A1, A2).  Guilarte, therefore, failed to mention the completed cell counts from the "Amphetamine-only" and "Amphetamine + Manganese" monkey groups (Figure 2-B1, B2).

221.    Guilarte consistently asked Relator to present her study findings in this manner.

222.    Guilarte avoided discussion with Relator on many occasions about the results from the "Amphetamine-only" and "Amphetamine + Manganese" monkeys, because their results differed from the large magnitude of cholinergic cell loss in the "Manganese-only" monkeys.

223.    Unlike the dopamine cell count studies, Guilarte claimed the striatal cholinergic study required male "naïve control" tissue for proper comparisons.  Guilarte also never proposed Relator combine the "naïve control" and "Amphetamine-only" groups for statistical analyses.

224.    Guilarte failed to provide rationale for the acquirement of the "Amphetamine-only" data that was unusable for statistical testing.  Grant Specific Aims 1 and 2 will also be impeded by this insufficient number of animals.

225.    Guilarte withheld pertinent information about the "control" group shown in Grant Figures 2 and 3.  Images were taken from a female "naïve control" monkey and a male "manganese-only" monkey.

### C.  Supporting Evidence

226.    Relator gathered evidence for these circumstances from multiple sources: federal grants, scientific publications, emails with Guilarte, meetings with Guilarte, weekly lab meetings with the Guilarte laboratory, and scientific (PowerPoint) presentations.

### X.       ADDITIONAL POINTS OF CONCERN

227.    Guilarte intentionally, knowingly and recklessly carried out the following cases of fraud and research misconduct prior to, during, and after submission of the "Primary Grant."

### A.  Guilarte's "Aging" Concern for the Dopamine but not the Cholinergic Studies
### i.   Introduction

228.    Guilarte has insistently made the false claim that the study's three "manganese-only" monkeys (Mn8, Mn10, and Mn12) were significantly older than the male "naïve control"

monkeys (WWP-1 through WWP-4), often defining the older monkeys as "aged." The monkeys had a maximum age difference of 4.7 years old (Table 2), which is equivalent to 14.1 human years. Guilarte raised the age issue **after** Relator presented her data set showing significant manganese-induced loss of dopamine cells (or TH protein downregulation), opposing Guilarte's long-standing hypothesis. Previous scientific literature demonstrated that nigral dopamine cell loss becomes significant around $\geq$ 20 years old,[10] differing from Guilarte's statement.

| Exposure Group | Animal ID | Age |
|---|---|---|
| **Naïve Control** | | |
| | 4 | 6.4 |
| | 5 | 7.0 |
| | 6 | 7.4 |
| | 7 | 6.8 |
| **Manganese-only** | | |
| | Mn8 | 11.1 |
| | Mn10 | 10.7 |
| | Mn12 | 10.5 |

**Table 2.** Comparison of age between "naïve control" and "manganese-only" monkeys in question by Guilarte and related to the dopamine cell counts.

### ii.  Fraud and Falsification of Design, Data, and Statistical Analyses

#### a)  Approved Age of Animals at Time of Purchase

229.    Relator purchased all male "naïve control" monkeys from external primate centers with prior approval by Guilarte, on three occasions: (1) July 10, 2015; (2) February 22, 2017; and (3) January 31, 2018.

230.    Relator received final approval of the monkey ages to be purchased by asking Guilarte and Dziedzic, because the "original" monkey cohort's ages were withheld from her.

---

[10] Scientific references available upon request.

231.    Guilarte and Dziedzic requested and accepted different ages for all three cohort purchases: **Cohort 1:** 4-8 years old; **Cohort 2:** 6-8 years old; and **Cohort 3:** 8-11 years old.

232.    In contrast, the "original" monkey cohort from Schneider's laboratory (*i.e.,* Mn1-Mn15) at Thomas Jefferson University ranged in age from **8.7-10.3 years old**.  Guilarte, therefore, approved the purchase of two monkey cohorts at younger ages than the experimental animals.  He never mentioned a potential aging issue at this point.

### b)  Significant Timing of Proposed Theory

233.    Biostaticians disapprove of researchers "measuring additional variables (such as age) that enable later exclusion of animals from the statistical analyses."[11]  The completed cell counts cannot be excluded from the final statistical tests and report of the results in scientific publications.  This decision should have been decided *a priori,* not *impromptu,* excluding the "aged" monkeys from the studies in the first place.

234.    Guilarte proposed the "aging" concept only after Relator revealed a significant loss of dopamine cells (or TH protein downregulation) after (1) amphetamine, (2) manganese, or (3) amphetamine + manganese exposure compared to male "naïve control" monkeys.

235.    In May 2018, Guilarte told Relator to use "age" as a "covariate" for her future statistical analyses.

### c)  Selective Reporting: Inconsistent Aging Claims

236.    Guilarte made inconsistent, false claims about the classification of the study animals' ages in his NIH-funded grants, publications, and weekly laboratory meetings.

237.    Guilarte used alternative inclusion and exclusion criteria for the statistical analyses of the grant project's animals.

---

[11] Wicherts JM et al. (2016). Degrees of freedom in planning, running, analyzing, and reporting psychological studies: A checklist to avoid p-hacking. Front Psychol (7): 1832. (PMID): 27933012.

238.    Guilarte excluded the **male "naïve control" monkeys** from the results of a potential publication describing the effects of manganese exposure on dopamine cell counts. Guilarte falsely insisted these monkeys were "older" or "aged" animals.

239.    In contrast, Guilarte approved **these same control animals** for future statistical comparisons in the "Primary Grant" studies of the cholinergic system. In this instance, Guilarte classified these same monkeys (Grant Table 1) as "young adults," in agreement with statements from his earlier scientific publications financed by federal funds.

240.    Guilarte proceeded further by stating in the grant that these **male "naïve control" monkeys** would not display signs of "aging" based on their young age.

241.    After grant submission, Guilarte stated that Relator could also not use these **male "naïve controls"** for her cholinergic cell counts if this system was altered by "aging" (which it is). Guilarte, therefore, was implying that "Primary Grant Specifics Aim 1 and 2" were suddenly not feasible for data acquisition.

242.    On numerous occasions, Guilarte knowingly and intentionally manipulated the data and statistical results from previous scientific literature to fit his aging hypothesis. Guilarte miscited the literature stating that a significant loss of nigral dopamine cells occurred during "middle" age (never specified its definition) compared to "younger" aged monkeys.

243.    During FIU's inquiry into Guilarte's alleged research misconduct, he knowingly and intentionally misled the Inquiry Committee about the previous aging findings to defend his hypothesis that manganese toxicity does not cause dopamine cell loss, and thus, Relator's multiple cell counts must be wrong.

**d) Unethical Duplication of Results**

244.   Because Guilarte insisted Relator's final results from dopamine cell counts stemmed from a "significant" age difference of animals, he obligated her to purchase a third monkey cohort of male "naïve control" monkeys (*i.e.,* the "fourth cohort" of monkeys).

245.   Guilarte unnecessarily and unethically had Relator duplicate results a fourth time to support his long-standing hypothesis and disprove Relator's results of dopamine cell loss.

### e)   Misuse of Non-human Primates in Research

246.   Guilarte displayed noncompliance, carelessness and animal welfare concerns in regard to his usage of monkey brain and spinal cord tissue prior to and after the "Primary Grant" submission.[12]

247.   Guilarte duplicated experiments (for the dopamine cell counts) requiring the needless euthanization of more monkeys at a prime breeding age.

248.   Guilarte risked damage to the brain tissue of five monkeys (Mn3, Mn6, Mn9, Mn11, and Mn15) during post-processing (*i.e.,* after euthanasia), in opposition to Relator's expertise and recommendations.  Three of these monkeys exhibited either freezing artifact or inter-mixed right and left brain hemispheres in the striatum, and therefore, were unusable for the cholinergic cell counts discussed in the "Primary Grant" – Specific Aim 1.  Guilarte included these animals in the grant studies.

249.   Relator reported her concerns to the Director of Research Integrity at FIU.

### f)   Result of Last Experiment using Monkey Cohort 3

250.   Relator's last experiment to count dopamine cells from 26 monkeys was ruined by contamination from the main laboratory refrigerator by another Guilarte lab member.  Relator had asked Ms. Dziedzic on two separate occasions to speak to said lab member about her expired, possibly contaminated, solutions.

---

[12] https://olaw.nih.gov/

251.    This lab member had been given her notice for questionable practices in the laboratory, but Guilarte allowed her to stay an extra six months to perform more experiments.

252.    Without evidence, Guilarte and Dziedzic assumed Relator's experiment was usable, contrary to Relator's conclusions.  Guilarte proceeded to corner and criticize Relator, accusing her of "overreacting" to the loss of her entire experiment and materials.  Guilarte berated Relator to the point she broke down in the lab.

253.    Guilarte avoided discussing the contamination problem in the laboratory and demanded Relator prove her experiment was unusable in the weekly lab meeting.

254.    Guilarte allowed other lab members to discard their materials from the contaminated refrigerator, but scolded Relator when she requested the same thing.

255.    Relator confirmed her experiment was unusable under the microscope and took representative images.

256.    Because of Guilarte's resistance to Relator's conclusions, she became concerned that Guilarte may force her to use the contaminated tissue for her publication, and if she resisted, he would retaliate against her again.

257.    A short-time afterward, Relator took a medical leave.


### iii. Supporting Evidence

258.    Relator gathered evidence for these circumstances from multiple sources: federal grants, scientific publications, emails with Guilarte, meetings with Guilarte, weekly lab meetings with the Guilarte laboratory, and scientific (PowerPoint) presentations.

### B.  Guilarte Falsified Information for Publications in Scientific Journals

### i. Introduction

259.    Guilarte knowingly allowed false and misleading information to enter the research record to increase his laboratory's number of scientific publications and subsequent citations.

260.    One essential factor to obtain successful NIH grant funding is to have enough scientific publications and citations in well-respected journals.  Guilarte, therefore, increased his chance to secure future federal grant funding by inflating his projects' achievements.

261.    In the "Acknowledgements" section, Guilarte's publications listed NIH-federal grant numbers as responsible for funding its studies.  The two NIH grants listed for the manganese-related publications were **5R01 ES010975** and **R01 ES029344**.

262.    The following events further confirm Guilarte's systemic, pattern of intentional, cognizant, and reckless behavior of his publications in scientific journals, matching that of his 2017 NIH "Primary Grant" application.

### ii. Fraud and Falsification of Design, Data, and Statistical Analyses in Publications

263.    Guilarte's scientific publications related to the manganese project were published from 2006 to 2019, consisting of 16 papers.[13]

264.    Guilarte was usually the "Corresponding Author" for these publications, signifying his responsibility for their content.

265.    Guilarte knowingly corrected or discarded data during data collection.

266.    Guilarte determined the data collection "stopping rule" based on desired results.

267.    Guilarte presented results in a manner that failed to assure reproducibility and enable replication.

---

[13] Publication identification numbers available upon request.

268.     Guilarte improperly inflated conclusions from his manganese studies based largely on qualitative observations and methods.

269.     Guilarte fabricated "results" awaiting confirmation and publication.   Guilarte enforced these "results" in arguments against other research groups. (PMID: 29173993)

270.     Guilarte omitted "outlier data" from his scientific publications without appropriate pre-experiment justification or thorough statistical validation.   Guilarte altered the overall conclusions of his statistical analyses and results.

271.     Guilarte failed to mention pertinent information related to the scientific studies, misrepresenting, or misidentifying the study design.

272.     Guilarte partook in "p-hacking" of statistical analyses, *i.e.,* "the practice of reanalyzing data in many ways to yield a target result."[14]   This unethical attempt results in false positives: "findings that statistics suggest are meaningful when they are not."[15]

- As in other publications, Relator witnessed Guilarte's unethical approach when analyzing and describing his study's results in his most recent publication (PMID: 30720866), indicating his patterned unprofessional behavior.

- "P-hacking" also occurs when one manipulates and/or continuously reanalyzes the data to find a lack of statistical significance, as Guilarte attempted with the dopaminergic cell counts in manganese-exposed monkeys.

### iii. Amphetamine-Exposed Animals: "Imaged Controls"

273.     Guilarte manipulated independent variables by discarding or combining levels of factors such as amphetamine and/or manganese, interfering with the interpretation and reporting of federally-funded results.

---

[14] https://www.ncbi.nlm.nih.gov/pubmed/22006061
[15] https://www.ncbi.nlm.nih.gov/pubmed/25204545

**Table 3.** Comparison of amphetamine-exposed monkeys that were "Properly Labeled" (blue), "Improperly Labeled" (red), "Unspecified" (orange), or "Unspecified but likely" (light orange) in publications from the Guilarte laboratory from 2006-2019. The increase in misrepresentation and concealment of experimental groups and data origin increased throughout the years and occurred for both monkey cohorts. A consistent pattern of selective reporting and concealment are shown.

274.     Guilarte falsified and neglected to inform readers about the true identity of the *"naïve control"* or *"control"* animals in 14/16 of his publications related to chronically manganese-exposed monkeys (2006-2019) (refer to Table 3).

275.     Originally, Guilarte displayed transparency about his *"control"* groups in his 2008 publication (PMID: 18808452). He described statistical comparisons between "amphetamine + manganese" monkeys and "naïve controls" or "Imaged controls" (amphetamine-only).

276.     Afterward, Guilarte refrained from mentioning the "Imaged controls" were exposed to amphetamine, and he rarely, if at all, discussed the effects of amphetamine on the study's results (Table 2).

277.     External readers cannot fully comprehend Guilarte's animal groupings because of improper experimental design and selective reporting in his publications. Relator was a project leader for these studies, and thus, had access to this information.

278.    Guilarte displayed similar deceitful behavior in his 2017 "Primary Grant" proposal funded by NIH-NIEHS.

### iv.  Supporting Evidence

279.    Relator gathered evidence for these circumstances from multiple sources: federal grants, scientific publications, emails with Guilarte, meetings with Guilarte, weekly lab meetings with the Guilarte laboratory, and scientific (PowerPoint) presentations.

### C.  Guilarte Interfered with the Performance of NIH-Funded Research

280.    At the time of Relator's medical leave, Guilarte's personal quest for evidence to support his dopamine hypothesis, and lack of proper oversight of his lab's management, resulted in duplication of results, baseless monkey euthanasia and a shortage of brain tissue for additional studies of dopamine cell counts.

281.    Guilarte used his unconfirmed dopamine hypothesis to inflate the importance of his other manganese-related studies to secure federal grant funding.

282.    The NIH-ORI states that "possible red flags of research misconduct" include a "lack of transparency" consisting of unknown locations of requested raw data and hidden research materials and protocols.[16]

- Guilarte withheld pertinent information related to various projects from his laboratory's faculty and staff, as well as external collaborators.  This behavior led to numerous employees resigning from their positions before their contracts retired, impeding progress on grant proposals.

- Guilarte falsely misled Relator about the status of her project before she joined his laboratory, indicating a false level of success, resulting in a significant delay in the production of results for grant progress reports.

---

[16] https://ori.hhs.gov/sites/default/files/2018-04/5_Red_Flags_of_Research_Misconduct.pdf

283.     Guilarte was not transparent about imperative details of Relator's federally funded project, causing a delay in progress, a waste of resources such as monkey brain tissue, a lack of scientific rigor, and a sense of distrust in his laboratory's environment.

- Amplified by his laboratory manager (Dziedzic), who acted unprofessionally and unethically, and bullied other lab members.

- Faulty research methods' protocols.  Data from these protocols have been published in many scientific publications that were federally funded by the NIH.

- Deliberate obstruction of Relator's participation in activities that would ensure the proper development and performance of experimental design, resulting in unusable or damaged brain tissue from 6 monkeys. (This information was hidden by Guilarte from the grant co-PI/collaborator, Dr. Schneider.)

284.     Guilarte knowingly withheld from Relator:

- Resources for proper experimentation to be carried out, such as properly maintained equipment and a clean, safe laboratory environment, directly impeding progress on grant proposals.

- Resources for grant progress such as potential FIU and external collaborators and computer software.

- Resources such as funding to attend conferences to receive feedback from the scientific community about experimental design and data analyses related to NIH-funded grants.

285.     Guilarte displayed abusive and retaliatory behaviors against Relator and other lab members, interfering with their progress to complete federally funded grant studies.


# XI.     FLORIDA INTERNATIONAL UNIVERSITY MADE FALSE CERTIFICATIONS
## B.    A Fraudulent "Primary Grant" Budget Created by Defendants

286.     Defendants inflated the budget for their "Primary Grant" to NIH-NIEHS in 2017. Under Guilarte's request, Ms. Dziedzic participated.

287.     Guilarte requested Relator provide a budget for her experiments under "Primary Grant" Specific Aims 1 and 2.  Relator anticipated an annual maximum of $15,000 - $20,000.

288.     While Relator was in Ms. Dziedzic's office, Guilarte called Ms. Dziedzic to tell her to further inflate the budget.

289.     Guilarte and Ms. Dziedzic asked Relator to invent extra expenses if possible. Relator informed them that her experiments did not require **$72,347** a year for three years, because a fair amount of the project was completed (Specific Aim 1).

290.     Defendants inappropriately requested funds for the salary (*i.e.,* 30% of $30,000) of a laboratory technician, who informed Guilarte in the summer 2017 (when the grant submitted) of his resignation in December 2017, five months before the "Primary Grant" funding began.

291.     Defendants verified the contents of the entire "Primary Grant" application before submitting to NIH-NIEHS.

292.     FIU receives around 35.00 – 46.50% of every federally-funded grant (*i.e.,* "fringe benefits" or "indirect cost rates") awarded to academic researchers at their university.[17]

### C.   Relator's "Good Faith" Allegation

293.     On September 27, 2018, Relator made an official "good faith" research misconduct allegation against Guilarte in the presence of Mr. Minick, Mr. Grayson (FIU-ORED), and Liz Marston (FIU legal representation), while exercising her federal right under the FMLA.

---

[17] http://research.fiu.edu/documents/facts-figures/documents/rateProposal.pdf

294.    At this meeting, Relator was informed that Guilarte reported her to FIU-ORED for research misconduct, stating she had stolen and deleted *"**all files** of your data and analysis from the past 5 years"* from his laboratory prior to her medical leave.

295.    FIU stalled their standard procedures to begin the "inquiry" process of a research misconduct allegation for seven months (from September 2018 to March 2019) based on Guilarte's false, "unofficial' accusations against Relator.

296.    Guilarte also inquired with ORED if he could immediately search for a candidate to replace Relator, while she was on medical leave.

297.    Relator was informed by a laboratory member that a large quantity of her data (i.e., 41 boxes of microscope slides) went missing from the Guilarte laboratory, which she reported to ORED during her meeting and other occasions.

298.    In November 2018, Relator was placed on a paid administrative leave by FIU's Human Resources department.

299.    In December 2018, Mr. Grayson phoned Relator to request she provide the *"data she had taken and/or deleted from the Guilarte laboratory."* Although an official FIU employee, Relator addressed Guilarte's accusations in an 8-page rebuttal and mailed a USB stick with additional data to ORED.

300.    On March 22, 2019, Relator was fired from FIU, *i.e.*, her contract was not renewed, for unidentified reasons.  FIU failed to protect Relator from retaliation by themselves and Guilarte.

301.    On April 23, 2019 – **seven months** after Relator made her "good faith" allegation, FIU's Research Misconduct Inquiry Committee met for the first time and "was given the charge by Dr. Gil of conducting an inquiry on allegations of possible research misconduct" into Guilarte.

The Committee "was to conduct an initial review of the evidence provided by the Complainant to determine whether a formal investigation of the Respondent was warranted."

- Inquiry Committee: **Dr. Robert Lickliter**, Professor of Psychology in the College of Arts, Sciences, and Education, Chair of the Committee; **Dr. Angela Laird**, Professor of Physics in the College of Arts, Science and Education; and **Dr. Nazira El-Hage**, Associate Professor in the Herbert Wertheim College of Medicine.

- Committee met on May 08, May 09, May 13, and May 17, 2019 to interview witnesses, the Complainant (Relator), and the Respondent (Guilarte).

302.    On April 24, 2019, Mr. Grayson (FIU-ORED) contacted Mr. Minick to request Relator undergo an interview with FIU's research misconduct "Inquiry Committee," failing to comply with their 10-day policy to begin the inquiry process.

303.    On May 9, 2019, Relator reported to FIU and fully cooperated with her questioning by the "Inquiry Committee."

304.    On June 3, 2019, Mr. Grayson emailed Relator the results of the inquiry into Guilarte's fraudulent actions:

"Although the allegation of misuse of public (federal) funds contained in the complaint does not constitute research misconduct, the Committee found no evidence to support it. Dr. Guilarte did order a third batch of primate tissue, and the Committee agreed that obtaining additional control group tissue was necessary, given any possible inconsistencies in the data due to differences in gender or age."

"In sum, the Committee concluded that there is not sufficient evidence to support the claim of research misconduct pertaining to falsification, misrepresentation, or omission of data on a federally-funded grant proposal."

305.    On June 12, 2019, Relator emailed her 10-page typed rebuttal to FIU.

306.    Throughout this time, Guilarte maintained his position as Dean of Public Health and Social Work and Principal Investigator of his laboratory at FIU.

## D.    Defendants' Failure to Uphold HHS Public Health Service Policies on Research Misconduct

307.    FIU failed to uphold the entirety of 42 C.F.R. § 93.300 (b): "respond to each allegation of research misconduct for which the institution is responsible under this part in a thorough, competent, objective and fair manner, including precautions to ensure that individuals responsible for carrying out any part of the research misconduct proceeding do not have unresolved personal, professional or financial conflicts of interest with the complainant, respondent or witnesses."

- Inquiry Committee did not address multiple allegations made by Relator.

- The interviewed witnesses (Dr. Yoo, Ms. Dziedzic, Ms. Garcia Guilarte, and Relator) were highly biased in Dean Guilarte's favor, as they report him.

- Dr. Yoo was listed on the R01 cholinergic grant, where he contradicted his previous recommendation for the statistical analyses to include four groups as Relator had suggested.

- Ms. Dziedzic, who has been Guilarte's lab manager for 20 years, was also listed on the grant application. She was unreliable with work-related issues, often agreeing with Dr. Guilarte's recommendations, regardless of its ethicality and suitability. She has reinforced the toxic Guilarte lab environment.  Relator filed a Human Resources complaint in the Summer 2018 and included her in Relator's Title VII and IX complaint in December 2018.

- FIU did not contact previous or current Guilarte laboratory members who witnessed Guilarte's unethical conduct and retaliation.

308.    FIU failed to foster a research environment that "promotes the responsible conduct of research, research training, discourages research misconduct, and deals promptly with

allegations or evidence of possible research misconduct," as required by the Regulations (42 C.F.R. § 93.300 (c), (d) and § 93.412 (a)).

309.    FIU allowed Guilarte, the Dean of Public Health, to receive federal funds from NIH grant applications while under an official Title IX investigation and research misconduct allegation (42 C.F.R. § 93.304 (h)): "Appropriate interim institutional actions to protect public health, Federal funds and equipment, and the integrity of the PHS supported research process." It is unknown if FIU notified the HHS Office of Research Integrity (ORI) of these matters and Relator's removal from the "Primary Grant."

- Principal Investigator: Guilarte. *Peripheral BDZ Receptor Biomarker of Neurotoxicity* (Project #: 5R01ES007062; 06/01/2017 – 05/21/2019), NIH-NIEHS.

- Principal Investigator: Guilarte. *Cholinergic Neuron Degeneration in Mn Neurotoxicity* (Project #: 5R01ES029344; 04/01/2018 – 03/31/2020), NIH-NIEHS.

- Principal Investigator: Guilarte. *NMDA Receptor Function in Lead Neurotoxicity* (Project #: 3R01ES006189; 09/01/2018 – 06/30/2020), NIH-NIEHS and NIA.

310.    FIU allowed Guilarte to maintain his status as principal of the FIU-RCMI Recruitment Core (42 C.F.R. § 93.304 (h)), which "focuses on hiring established health disparities investigators who have existing track records of independent research support by NIH..." Guilarte oversees these new hires, who will serve as mentors to FIU-RCMI faculty. The NIMHD allocates up to "$100,000 direct costs per year for up to two years for each newly hired health disparities investigators to augment institutional support." (Project#: 5U54MD012393; 07/01/2018 – 06/30/2019).

311.    FIU allowed Guilarte to enter into a \$3 million collaboration with Colombia's federal government and University of Universidad de Córdoba in Colombia while under an official research misconduct allegation and Title IX investigation (42 C.F.R. § 93.304 (h)).

312.    FIU allowed Guilarte to be featured in numerous media reports published by themselves and others.  As the Dean of Public Health and Social Work, he continued to make false statements in articles listed under Fact #45 (42 C.F.R. § 93.304 (h)).

313.    FIU failed to protect Relator (the "Complainant") (42 C.F.R. § 93.304 (l)):

"All reasonable and practical efforts to protect or restore the position and reputation of any complainant, witness, or committee member and to counter potential or actual retaliation against these complainants, witnesses, and committee members;"

314.    It is unknown if FIU secured Relator's 41 boxes of missing microscope slides and other data related to this research misconduct allegation (42 C.F.R. § 93.305 (a) and §93.307(b)).

315.    FIU failed to obtain other documents needed to conduct the "inquiry," which Relator previously offered to ORED (42 C.F.R. § 93.305 (a) and §93.307(b)).

"Either before or when the institution notifies the respondent of the allegation, **inquiry** or investigation, promptly take all reasonable and practical steps to obtain custody of all the **research records and evidence** needed to conduct the research misconduct proceeding, inventory the records and evidence, and sequester them in a secure manner..."

## XII.    COUNTS
### A.  Count One
### Violations of the False Claims Act
### (31 U.S.C. § 3729 (a)(1)(A))
### Presenting False Claims for Payment

316.    Plaintiff incorporates by reference paragraphs 1 through 316 above as if fully set forth herein.

317.    The United States seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

318.    As set forth above, Defendants certified their compliance with the NIH grant laws, rules, and regulations.  Defendants, knowingly or acting with deliberate ignorance or with reckless disregard for the truth, presented, or caused to be presented materially false and fraudulent claims for payment or approval in connection with the submission of its requests for grant money.

319.    The United States paid Defendants under the NIH grant program because of Defendants' fraudulent conduct.

320.    By reason of the Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

### B.  Count Two
### Violations of the False Claims Act
### (31 U.S.C. § 3729 (A)(1)(B))
### Use of False Statements

321.    Plaintiff incorporates by reference paragraphs 1 through 316 above as if fully set forth herein.

322.    The United States seeks relief against Defendants under Section § 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

323.    As set forth above, Defendants certified their compliance with the NIH grant program law, rules, and regulations.  Defendants, knowingly or acting in deliberate ignorance or in reckless disregard for the truth, made, used, or caused to be made materially false records and statements to get false or fraudulent claims paid or approved by the United States in connection with the submission of its requests for NIH grants funds.

324.     The United States paid such false or fraudulent claims because of Defendants' acts and conduct.

325.     By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

## C.  Count Three
### Violations of the False Claims Act

#### (31 U.S.C. § 3729(a)(1)(C))
#### Conspiracy to Commit Violations of the False Claims Act
#### (Against All Defendants)

326.     Plaintiff incorporates by reference paragraphs 1 through 316 above as if fully set forth herein.

327.     The United States seeks relief against Defendants under Section 3729(a)(1)(C) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

328.     As set forth above, Defendants conspired to commit a violation of subparagraph (A), (B), and (C) of the False Claims Act.  Defendants have committed at least one overt act in furtherance of their conspiracy.

329.     By reason of the Defendants' conspiracy, the United States has been damaged in a substantial amount to be determined at trial.

## D.  Count Four
### Violations of the Federal False Claims Act
#### (31 U.S.C.  §  3730(H))
### Retaliation against the Relator in Violation of the Federal False Claims Act

330.     Plaintiff incorporates by reference paragraphs 1 through 316 above as if fully set forth herein.

331.   As a result of Relator's lawful acts in furtherance of protected activities in the reporting of fraud, and Defendants' knowledge thereof, Defendants retaliated against Relator.

332.   Defendants' retaliatory acts against Relator included failure to promote, harassment, belittling, intimidation, denying opportunities to publish, speak, and confer with members of her scientific community, accusing Relator of ethical lapses, denying Relator of academic promotional growth opportunities, marginalizing Relator, and then ultimately terminating Relator.

333.   Defendants harassed, discriminated against, threatened, and ultimately discharged Relator because of lawful acts Relator undertook to stop violations of the False Claims Act and ultimately denied and concealed the fraudulent and false claims made by Defendants to obtain federal grant funding.

334.   Defendants' retaliatory acts caused Relator to suffer, and continue to suffer, compensatory and special damages, including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.

335.   Defendant's actions were knowing, malicious, willful, and with conscious disregard for Relator's rights under the law.  Relator is further entitled to exemplary and punitive damages in an amount to be determined at trial.

WHEREFORE, plaintiff the United States ex rel. Kalynda Gonzales Stokes Ph.D., requests that judgment be entered in their favor and against Defendants as follows:

a.  On the First, Second, and Third Claims for relief (Violations of the False Claims Act, 31 U.S.C. § 3729(a) (1) (A), (B), and (C)), for treble the United States' damages, in an amount to be determined at trial, plus an $11,000 penalty for each false claim; and

b.  Awarding Relator her relators' share pursuant to 31 U.S.C. § 3730(d)(1) or (2); and

c.  On the Fourth Claim for relief awarding Relator back pay, future pay, and benefits doubled pursuant to 31 U.S.C. 3730(h); and

d.  On the First, Second, Third and Fourth Claims for Relief, an award of costs and attorney's fees pursuant to 31 U.S.C. § 3730(d); and

e.  Awarding such further relief as is proper.

### E. Count Five
### Violation of the Title VII of the Civil Rights Act of 1964
### (42 U.S.C. § 2000e *et seq.*)
### Discrimination Based on Gender and Retaliation

335.  Relator incorporates by reference paragraphs 1 through 316 above as if fully set forth herein.

336.  Relator was hired by FIU on April 1, 2016 to work as a Postdoctoral Associate in Guilarte's laboratory.

337.  While working at FIU, Relator was the victim of discriminatory and retaliatory treatment by Guilarte, who targeted Relator and other of his female employees with relentless abusive behavior due to their gender.

338.  Although working together for more than three (3) years at Columbia University and FIU, Guilarte's attitude and treatment towards Relator detrimentally changed at FIU in early 2017, at the time Relator began to question his research ethics and motives.

339.    For nine (9) months, and after numerous disagreements, Relator urged Guilarte to allow Relator to report the laboratory's entire research findings to the scientific community, not only the data that supported his hypothesis. As a result, Guilarte began a persistent practice of harassment, bullying, intimidation, and retaliation against Relator, a behavior commonly directed at his female employees.

340.    Within his department of EHS at FIU, Guilarte solely invited male scientists for interviews for upper level academic positions, and preferentially hired male scientists for independent Professor roles, while hiring women into administrative roles.

341.    Since Guilarte's start at FIU in 2016 as Dean of Public Health and Social Work, at least four (4) female administrative assistants from his office have left their positions because of his abusive supervision. Multiple others have made clear that Guilarte bullied his female employees.

342.    Within his laboratory, Guilarte used Relator's research ideas for his own personal gain via grant applications and scientific publications, without giving Relator proper credit, and/or he minimized and excluded Relator's ideas. Guilarte's self-serving behavior decreased Relator's opportunities for independent research funding and career advancement.

343.    Guilarte enabled a toxic work environment for Relator and other female lab members by allowing his long-time laboratory manager to severely bully them; and placing work conflicts on them to handle amongst themselves.

344.    Including Relator, Guilarte had sixteen (16) previous female postdoctoral scientists, none of which progressed into academia, in opposition to the five (5) males. All female postdoctoral scientists, including Relator, either left science or accepted a lower level position.

345.    During her time at FIU, Relator was Guilarte's main target of abuse, having suffered excessive criticism and insults, unpredictable anger and yelling, the minimization of her research ideas and findings, and relentless bullying and humiliation.  Guilarte would not treat male members of his laboratory in the same matter.

346.    With regularity, Guilarte presented these abusive behaviors toward Relator both in private interactions and weekly group meetings. Guilarte also impeded productive and professional interactions about Relator's work product. When Relator presented her research findings during laboratory group meetings, Guilarte reverted to taunting and belittling her ideas and downplaying data that conflicted with his opinions. His abuse progressively worsened to the point Relator declined further presentation of her research in group meetings.

347.    Guilarte's public display of hostility towards Relator damaged her reputation as a scientist, placed Relator in a constant state of distress, and interfered with her productivity.

348.    Guilarte believed that he could mistreat Relator and other female members of his laboratory simply based on gender.

349.    However, Guilarte's behavior towards Relator went beyond bullying and harassment. Guilarte also retaliated against Relator following her refusal to comply with his demands to remove data from her research. *See supra.*  Specifically, Guilarte retaliated against Relator by isolating her, blocking her communication with fellow scientists, and himself, about her research projects.

350.    Guilarte also took direct action to impede Relator's career.  A postdoctoral position is a mechanism for advancement as a scientific researcher and a steppingstone for promotion to professorship.  It is customary that to advance in academia, a postdoctoral scientist must be a productive researcher demonstrated by publishing scientific articles, receiving grant monies, and

obtaining a vast career network in the scientific community. Guilarte repeatedly blocked Relator's attempts to publish her research in an ethical manner, access grant applications in which Relator had a significant role, and attend scientific conferences to present and receive feedback on Relator's findings.

351.    Further, Guilarte intentionally misguided Relator about her career advancement to Research Assistant Professor at FIU. Guilarte was deceitful to manipulate Relator into performing unnecessary, repetitive animal experiments, unethically fishing for results that would support his hypothesis. Guilarte lied and misled Relator for ten (10) months, giving Relator false confidence in her next career step and independence from her abuser.

352.    In early 2019, Relator's physician recommended that she take leave pursuant to the Family Medical and Leave Act ("FMLA") because of her worsening physical and mental condition due to Guilarte's abuse. Within the first week of her leave, Guilarte retaliated with a false accusation against Relator to FIU, accusing her of erasing and stealing research data.

353.    After three months leave, FIU placed Relator on paid administrative leave until March 2019. During this time, Relator met with FIU's Title IX officer to report Guilarte's gender discrimination and harassment, along with his research misconduct. FIU took no action, even though other staff members under Guilarte's supervision also filed grievances. FIU's administration and the Title IX officer failed to inform Relator about the outcome of her good faith allegations and to provide Relator with a summary of their findings. FIU's final response was to terminate Relator's employment in March 2019. FIU determined they had no place for Relator after her "actions."

354.    FIU has not corrected Guilarte's abusive behavior as reports of its continuance has surfaced. FIU is, therefore, protecting Guilarte and allowing him to continue his harassment and

discrimination against other female employees. Furthermore, FIU's protective behavior allows for their continued receipt of significant grant funding (i.e., millions of dollars) brought in by Guilarte.

355.    Relator was harassed, humiliated, and discriminated against by Guilarte and FIU, because Relator was in a position of limited authority as a female junior scientist. Relator was automatically suspectable to the detrimental outcomes of a corrupt hierarchy, and Guilarte and FIU wrongly took advantage of Relator' disposition. Moreover, FIU and Guilarte retaliated against Relator to the point Relator lost her job and academic career.

356.    As a result of Guilarte's and FIU's abusive and discriminatory behavior, Relator has left academia due to difficulty finding a place that will accept the career "red flags" imposed on her by Guilarte and FIU. Relator has endured great pain and sorrow from his abuse and the loss of her academic career, because FIU refused to hold Guilarte responsible for his gender abuse.

357.    The foregoing facts and circumstances demonstrate that FIU and Guilarte have violated Title VII of the Civil Rights Act of 1964, as amended, by discriminating against Relator with respect to the terms or conditions of her employment because of her sex.

358.    FIU and its agents and employees, and Guilarte, knew, or should have known, that the above-referenced actions were discriminatory and violated Title VII of the Civil Rights Act of 1964, as amended. Nevertheless, FIU and its agents, and Guilarte, acted willfully, intentionally, and in reckless disregard for the rights of Relator.

359.    As a direct and proximate result of the actions of FIU and its agents and employees, and Guilarte, Relator has suffered mental anguish, physical discomfort, pain and suffering, humiliation, and embarrassment. Furthermore, Relator has and will continue to suffer lost wages.

360.    Moreover, Relator has suffered a diminished ability to earn a living and a diminished capacity to enjoy her life. Relator has and/or may have to incur expenses for medical,

psychiatric, and/or psychological counseling and care. Relator's damages have been experienced in the past, and they will continue into the future.

361.    All conditions precedent to bringing this action have occurred.

362.    Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

363.    A notification of Right to Sue was received from the EEOC. This Complaint has been filed within ninety (90) days of receipt thereof.

WHEREFORE, Relator demands damages for lost wages and benefits, back pay, front pay, damages for humiliation, loss of capacity to enjoy life, mental and emotional distress, physical discomfort, compensatory damages, punitive damages, interest – including pre-judgment interest on lost wages, costs and attorney's fees, and such other relief as this Court deems appropriate.

### F.  Count Six
### Violation of the Florida Civil Rights Act of 1992
### (Florida Statutes, § 760 *et seq.*)
### Discrimination Based on Gender and Retaliation

364.    Relator incorporates by reference paragraphs 1 through 316 above as if fully set forth herein.

365.    Relator was hired by FIU on April 1, 2016 to work as a Postdoctoral Associate in Guilarte's laboratory.

366.    While working at FIU, Relator was the victim of discriminatory and retaliatory treatment by Guilarte, who targeted Relator and other of his female employees with relentless abusive behavior due to their gender.

367.    Although working together for more than three (3) years at Columbia University and FIU, Guilarte's attitude and treatment towards Relator detrimentally changed at FIU in early 2017, at the time Relator began to question his research ethics and motives.

368.    For nine (9) months, and after numerous disagreements, Relator urged Guilarte to allow Relator to report the laboratory's entire research findings to the scientific community, not only the data that supported his hypothesis. As a result, Guilarte began a persistent practice of harassment, bullying, intimidation, and retaliation against Relator, a behavior commonly directed at his female employees.

369.    Within his department of EHS at FIU, Guilarte solely invited male scientists for interviews for upper level academic positions, and preferentially hired male scientists for independent Professor roles, while hiring women into administrative roles.

370.    Since Guilarte's start at FIU in 2016 as Dean of Public Health and Social Work, at least four (4) female administrative assistants from his office have left their positions because of his abusive supervision. Multiple others have made clear that Guilarte bullied his female employees.

371.    Within his laboratory, Guilarte used Relator's research ideas for his own personal gain via grant applications and scientific publications, without giving Relator proper credit, and/or he minimized and excluded Relator's ideas. Guilarte's self-serving behavior decreased Relator's opportunities for independent research funding and career advancement.

372.    Guilarte enabled a toxic work environment for Relator and other female lab members by allowing his long-time laboratory manager to severely bully them; and placing work conflicts on them to handle amongst themselves.

373.    Including Relator, Guilarte had sixteen (16) previous female postdoctoral scientists, none of which progressed into academia, in opposition to the five (5) males. All female postdoctoral scientists, including Relator, either left science or accepted a lower level position.

374.    During her time at FIU, Relator was Guilarte's main target of abuse, having suffered excessive criticism and insults, unpredictable anger and yelling, the minimization of her research ideas and findings, and relentless bullying and humiliation.  Guilarte would not treat male members of his laboratory in the same matter.

375.    With regularity, Guilarte presented these abusive behaviors toward Relator both in private interactions and weekly group meetings. Guilarte also impeded productive and professional interactions about Relator's work product. When Relator presented her research findings during laboratory group meetings, Guilarte reverted to taunting and belittling her ideas and downplaying data that conflicted with his opinions. His abuse progressively worsened to the point Relator declined further presentation of her research in group meetings.

376.    Guilarte's public display of hostility towards Relator damaged her reputation as a scientist, placed Relator in a constant state of distress, and interfered with her productivity.

377.    Guilarte believed that he could mistreat Relator and other female members of his laboratory simply based on gender.

378.    However, Guilarte's behavior towards Relator went beyond bullying and harassment. Guilarte also retaliated against Relator following her refusal to comply with his demands to remove data from her research. *See supra.*  Specifically, Guilarte retaliated against Relator by isolating her, blocking her communication with fellow scientists, and himself, about her research projects.

379.    Guilarte also took direct action to impede Relator's career.  A postdoctoral position is a mechanism for advancement as a scientific researcher and a steppingstone for promotion to professorship.  It is customary that to advance in academia, a postdoctoral scientist must be a productive researcher demonstrated by publishing scientific articles, receiving grant monies, and obtaining a vast career network in the scientific community. Guilarte repeatedly blocked Relator's attempts to publish her research in an ethical manner, access grant applications in which Relator had a significant role, and attend scientific conferences to present and receive feedback on Relator's findings.

380.    Further, Guilarte intentionally misguided Relator about her career advancement to Research Assistant Professor at FIU. Guilarte was deceitful to manipulate Relator into performing unnecessary, repetitive animal experiments, unethically fishing for results that would support his hypothesis. Guilarte lied and misled Relator for ten (10) months, giving Relator false confidence in her next career step and independence from her abuser.

381.    In early 2019, Relator's physician recommended that she take leave pursuant to the Family Medical and Leave Act ("FMLA") because of her worsening physical and mental condition due to Guilarte's abuse. Within the first week of her leave, Guilarte retaliated with a false accusation against Relator to FIU, accusing her of erasing and stealing research data.

382.    After three months leave, FIU placed Relator on paid administrative leave until March 2019. During this time, Relator met with FIU's Title IX officer to report Guilarte's gender discrimination and harassment, along with his research misconduct. FIU took no action, even though other staff members under Guilarte's supervision also filed grievances. FIU's administration and the Title IX officer failed to inform Relator about the outcome of her good faith allegations and to provide Relator with a summary of their findings. FIU's final response was to

terminate Relator's employment in March 2019. FIU determined they had no place for Relator after her "actions."

383.     FIU has not corrected Guilarte's abusive behavior as reports of its continuance has surfaced. FIU is, therefore, protecting Guilarte and allowing him to continue his harassment and discrimination against other female employees. Furthermore, FIU's protective behavior allows for their continued receipt of significant grant funding (i.e., millions of dollars) brought in by Guilarte.

384.     Relator was harassed, humiliated, and discriminated against by Guilarte and FIU, because Relator was in a position of limited authority as a female junior scientist. Relator was automatically suspectable to the detrimental outcomes of a corrupt hierarchy, and Guilarte and FIU wrongly took advantage of Relator' disposition. Moreover, FIU and Guilarte retaliated against Relator to the point Relator lost her job and academic career.

385.     As a result of Guilarte's and FIU's abusive and discriminatory behavior, Relator has left academia due to difficulty finding a place that will accept the career "red flags" imposed on her by Guilarte and FIU. Relator has endured great pain and sorrow from his abuse and the loss of her academic career, because FIU refused to hold Guilarte responsible for his gender abuse.

386.     The foregoing facts and circumstances demonstrate that FIU and Guilarte have violated the Florida Civil Rights Act of 1992 by discriminating against Relator with respect to the terms or conditions of her employment because of her sex.

387.     FIU and its agents and employees, and Guilarte, knew, or should have known, that the above-referenced actions were discriminatory and violated the Florida Civil Rights Act of 1992. Nevertheless, FIU and its agents, and Guilarte, acted willfully, intentionally, and in reckless disregard for the rights of Relator.

388.    As a direct and proximate result of the actions of FIU and its agents and employees, and Guilarte, Relator has suffered mental anguish, physical discomfort, pain and suffering, humiliation, and embarrassment. Furthermore, Relator has and will continue to suffer lost wages.

389.    Moreover, Relator has suffered a diminished ability to earn a living and a diminished capacity to enjoy her life. Relator has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling and care. Relator's damages have been experienced in the past, and they will continue into the future.

390.    All conditions precedent to bringing this action have occurred.

391.    Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

392.    A notification of Right to Sue was received from the EEOC. This Complaint has been filed within ninety (90) days of receipt thereof.

WHEREFORE, Relator demands damages for lost wages and benefits, back pay, front pay, damages for humiliation, loss of capacity to enjoy life, mental and emotional distress, physical discomfort, compensatory damages, punitive damages, interest – including pre-judgment interest on lost wages, costs and attorney's fees, and such other relief as this Court deems appropriate.

**JURY TRIAL IS DEMANDED**

Dated:  December 18, 2019

Respectfully submitted,

JONATHAN S. MINICK, PA

Jonathan Minick, Esq.
Fla Bar 0088743
169 E. Flagler St., Suite 1600
Miami, FL 33131
Tel. No.: (786) 441-8909
jminick@jsmlawpa.com


THE JOSEPHS LAW FIRM
Adam C. Josephs, Esq.
Fla Bar 050895
2100 Ponce de Leon Blvd, Suite 1290
Coral Gables, FL 33134
Tel. No.: (305)445-3800
acj@florida-attorneys.com


ROBERT W. SADOWSKI PLLC
Robert W. Sadowski, Esq.
N.Y. Bar  2023794
800 Third Ave., 28th Floor
New York, NY 10022
Tel: 646-503-5341
RSadowski@RobertWSadowski.com
(*Pro hac vice pending*)

*Attorneys for Relator Kalynda Gonzales Stokes, Ph.D.*

## XIII.   APPENDIX

**DEFINITIONS** (listed in alphabetical order):

- **Acetylcholine:** a neurotransmitter or chemical in the brain
- **Alzheimer's disease (AD):** an irreversible, progressive brain disorder that slowly destroys memory and thinking skills, and eventually the ability to carry out the simplest tasks. It is the cause of 60–70% of cases of dementia.
- **Amphetamine:** a drug that activates the dopaminergic brain system
- **Cholinergic:** refers to a cell or brain system that contains the neurotransmitter acetylcholine
- **Choline acetyl transferase (ChAT):** the synthesizing enzyme for acetylcholine, which can be used to visualize acetylcholine/cholinergic cells in the brain
- **Corresponding author:** this individual is *"usually the senior author who is responsible for the manuscript correction, proof reading, whole correspondence during the paper submission, handling the revisions and re-submission of revised manuscripts up to the acceptance of the manuscripts. This is the usual practice in most cases."*
- **Dopamine:** a neurotransmitter or chemical in the brain
- **Dopaminergic:** refers to a cell or brain system that contains the neurotransmitter dopamine
- **Falsification:** *"manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record"* (Sec. 93.103 Research misconduct in 42 CFR Part 93 Public Health Service, Public health service policies on research misconduct)
- **Fabrication:** making up data or results and recording or reporting them.
- **Falsification:** manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.
- **Immunohistochemistry or Immunostaining or Immunolabeling:** uses the antibody-antigen binding principle of the immune system to visualize proteins located in brain cells. For Relator's studies discussed here, the brain cells of the striatum (the cholinergic neurons) and SNpc (the dopaminergic neurons) were labeled with a brownish red color.
- **Institutional National Research Service Award (T32 NRSA):** an NIH federal grant that "provides individual research training opportunities (including international) to trainees at

the undergraduate, graduate, and postdoctoral levels" and "enables institutions to recruit individuals selected by the program leadership for predoctoral and/or postdoctoral research training in specified scientific areas"
(https://researchtraining.nih.gov/programs/training-grants/T32).

- **Key Personnel:** "The PD/PI and other individuals who contribute to the scientific development or execution of a project in a substantive, measurable way to the scientific development or execution of the project, whether or not they receive salaries or compensation under the grant. i.e., their absence from the project would be expected to impact the approved scope of the project. Consultants and those with a postdoctoral role also may be considered senior/key personnel if they meet this definition."
(https://grants.nih.gov/grants/policy/senior_key_personnel_faqs.htm)

- **Manganese (Mn):** a natural trace element required for physiological processes in the human body and brain. Medical problems occur if the body has insufficient or excessive levels of manganese. Manganese has many industrial uses, particularly in stainless steel and aluminum alloy production, but also used as an additive in unleaded gasoline, a pigment for the coloring of ceramics and glass, and an electron acceptor of zinc used in batteries.

- **Manganese-induced parkinsonism:** a parkinsonian-like disorder instigated by manganese toxicity; also referred to as **"manganism."**

- **Naïve Control:** an animal that has not undergone any experimental testing or exposure to toxicants

- **Neuromelanin (NM):** a pigment found to co-exist in dopamine cells of the substantia nigra pars compacta region of the primate brain

- **Neuropathology:** the study of diseases of the nervous system, and typically includes the laboratory analysis of tissue samples for personalized diagnosis or forensic investigations

- **Non-human Primates (NHPs):** monkeys

- **Nucleus Basalis of Meynert (NBM):** a region of the brain enriched with neurons that contain the neurochemical neurons are enriched in acetylcholine; consists of multiple nuclei or brain structures

- **Parkinson's disease (PD):** a neurodegenerative disorder that affects predominately dopamine-producing ("dopaminergic") neurons in a specific area of the brain called the substantia nigra pars compacta. Symptoms generally develop slowly over years.

- **Parkinsonism:** a term used to describe the collection of signs and symptoms found in Parkinson's disease (PD). These include slowness (bradykinesia), stiffness (rigidity), tremor and imbalance (postural instability). Conditions other than PD may have one or more of these symptoms, mimicking Parkinson's.

- **Plagiarism:** the appropriation of another person's ideas, processes, results, or words without giving appropriate credit.

- **Postdoctoral Scientist (postdoc):** a scientist professionally conducting research after the completion of their doctoral studies (i.e., a Ph.D. degree) under the supervision of a mentor/adviser who is the Principal Investigator of their workplace laboratory

- **Principal Investigator (P.I.):** a Ph.D.-holding scientist who is the director of his/her own laboratory and/or the Project Leader for an NIH grant

- **Research Project Grant (R01):** is an NIH federal grant that supports "a discrete, specified, circumscribed project to be performed by the named investigator(s) in an area representing the investigator's specific interest and competencies, based on the mission of the NIH" (https://grants.nih.gov/grants/funding/r01.htm).

- **Retaliation:** occurs when an employer punishes an employee for engaging in legally protected activity, such as making an allegation of harassment or participating in an administrative inquiry. Retaliation can include any negative job action, such as demotion, discipline, firing, salary reduction, or job or shift reassignment. But retaliation can also be subtler.

- **Selective Reporting:** when an individual presents biased information by not acknowledging conflicting evidence and alternative interpretations.

- **Stereology:** a rigorous method used to count the number of cells in an unbiased manner

- **Striatal Cholinergic neurons**: specialized cells that contain acetylcholine and reside within the striatum

- **Striatum:** "striatal," a part of the brain involved with movement and cognitive processes

- **Substantia nigra pars compacta (SNpc):** "nigra" or "nigral", a part of the brain involved with movement and cognitive processes. Main brain region negatively affected in Parkinson's disease.

- **Tyrosine hydroxylase (TH):** a precursor enzyme for the synthesis of dopamine; used to visualize brain cells that contain dopamine

- **<u>NIH-NIMHD Specialized Centers of Excellence on Minority Health and Health Disparities—Cooperative Agreements (U54)</u>:**  an NIH federal grant from the National Institute of Minorities Health and Health Disparities (NIMHD) that supports "any part of the full range of research and development from very basic to clinical; may involve ancillary supportive activities such as protracted patient care necessary to the primary research or R&D effort. The spectrum of activities comprises a multidisciplinary attack on a specific disease entity or biomedical problem area. These differ from program project in that they are usually developed in response to an announcement of the programmatic needs of an Institute or Division and subsequently receive continuous attention from its staff. Centers may also serve as regional or national resources for special research purposes, with funding component staff helping to identify appropriate priority needs."
   (https://grants.nih.gov/grants/guide/rfa-files/rfa-md-17-005.html).